# STATE OF CONNECTICUT *v.* CHRISTOPHER SMITH
## (SC 16973)

Sullivan, C. J., and Borden, Palmer, Vertefeuille and Zarella, Js.

Argued February 14—officially released August 30, 2005

*G. Douglas Nash*, special public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich*, state's attorney, *Mark A. Stabile*, supervisory assistant state's attorney, and *Vincent Dooley*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant appeals[1] from the trial court's judgment of conviction, rendered after a jury trial, of one count of murder in violation of General Statutes § 53a-54a (a), two counts of assault of a peace officer in violation of General Statutes § 53a-167c (a) (1), and one count of intimidation of a witness in violation of General Statutes § 53a-151a (a) (1). The defendant claims that the trial court improperly: (1) admitted, under the state of mind exception to the hearsay rule, several statements attributed to the victim; (2) charged the jury concerning the intent to be ascribed to a person who uses a deadly weapon on the vital part of another person; and (3) charged the jury concerning the presumption of innocence and proof beyond a reasonable doubt. We affirm the judgment of the trial court.

---

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

The defendant, Christopher Smith, was charged with one count of murder in violation of § 53a-54a (a), two counts of assault of a peace officer in violation of § 53a-167c (a) (1), and one count of intimidation of a witness in violation of § 53a-151a (a) (1). The jury found the defendant guilty of all charges. The trial court rendered judgment of conviction in accordance with the verdict. This appeal followed.

The jury reasonably could have found the following facts. The defendant was romantically involved with the victim, Elizabeth Ross, during the six to seven month period prior to her death on April 8, 2001. Prior to and during that same time period, the defendant was also romantically involved with Christie Auger. Despite the defendant's denials to Auger that he was romantically involved with the victim, Auger was aware of his relationship with the victim. Auger's awareness of the defendant's relationship with the victim led to several incidents between the two women during the months leading up to the victim's death.[2] The last of these incidents occurred the night before the victim's death when

[2] Auger's car was vandalized while it was parked in a lot next to the defendant's apartment. Believing the victim to be responsible for the vandalism, Auger went to the victim's home armed with a hammer. The victim refused to come out of the house and denied committing the vandalism. A few days later, Auger entered another person's home and assaulted the victim.

On another occasion, while Auger was outside of the defendant's apartment, the victim drove by the apartment with a passenger in her vehicle. One of the vehicle's occupants fired a BB gun at Auger.

Approximately one week before the victim's death, Auger drove to the victim's residence to pick up the defendant, who had borrowed the victim's car. When Auger arrived, the victim began punching Auger's car. This behavior prompted Auger to get out of her car and kick the victim's car hard enough to dent it. A fight then ensued between Auger and the victim that lasted approximately one minute.

During that same time frame, the sliding glass door to the defendant's apartment, which had been leased in Auger's name, was intentionally broken. Auger attributed the vandalism to the victim. Although Auger's name was on the apartment lease, and she spent the night at the apartment with the defendant on occasion, she did not reside at the apartment.

the victim used a baseball bat to smash the glass out of a side window of Auger's car while it was parked at Joker's Cafe, a local bar in Dayville.

Although the defendant was with Auger inside the bar when this incident occurred, he had been with the victim earlier that day. At approximately 4 a.m. on April 7, 2001, the victim's mother, Patricia Ross, and her boyfriend, Peter Ouellette, were awakened by screaming and crying coming from the victim's adjacent bedroom. Upon entering the victim's bedroom, Ouellette noticed that the victim was standing by the door crying, while the defendant was kneeling by the window with his handgun nearby on the windowsill. After assuring Patricia Ross that everything was all right, the victim drove the defendant to his apartment. The defendant spent the rest of the early morning hours at his apartment with Auger. After work that day, Auger returned to her home, where she resided with her father, stepmother and sister, and called the defendant. A few minutes later, the defendant returned her call from outside her home. When the defendant got into Auger's car with her, he displayed his handgun and asked her to put it in her house, which Auger did. After eating dinner at the defendant's apartment, the two proceeded to Joker's Cafe.

Upon discovering the broken window in her car, Auger suspected the victim of having smashed it. After assuring Auger that he would take care of it, the defendant returned with Auger to her home, where she retrieved the defendant's handgun at his request. The two then proceeded to a location near the victim's neighborhood, where the defendant exited the car, taking his handgun with him. After waiting in her car for approximately thirty minutes, Auger attempted to reach the defendant on his cellular telephone before driving around to look for him. Auger located the defendant standing on the sidewalk next to the victim's house.

After the two returned to the defendant's apartment, the defendant told Auger that he was going to shoot the victim in the head, smash out a window in her car or have a friend, Tyrus Hines, steal her car. Auger remained at the defendant's apartment that night.

The next day, April 8, 2001, after taking the defendant to the residence of Amanda Cahoon, the mother of the defendant's daughter, Auger returned to her home, where she did the defendant's laundry. Meanwhile, the defendant placed ten separate telephone calls to the victim. He placed the first telephone call at 12:38 p.m.; he placed the last telephone call at 5:42 p.m. The defendant met with the victim sometime after placing the last telephone call.

The defendant called Auger sometime between 7:30 and 8 p.m. that night to request that she pick him up on Wrights Crossing Road, near the home of a friend of hers. When Auger picked him up, the defendant instructed her to drive down Holmes Road, a dirt road that intersects Wrights Crossing Road. While driving down Holmes Road, Auger observed the victim's car on the side of the road. The defendant directed Auger to drive past the victim's car, turn around in a driveway up the road, and drive past the car a second time. Auger noticed that the headlights and interior lights in the victim's car were on, and that the driver's side window had been broken; she did not see anyone in the car. The defendant told Auger, after she had driven by the car the second time, that "it" was taken care of.

Auger then drove the defendant back to his apartment, where, upon arrival, she observed a blood spot on his shirt. The defendant removed his blue jeans, white shirt and gray boots and placed them on the kitchen floor while he showered. After he showered, he gathered the clothing from the kitchen floor and placed it in a black garbage bag. As the defendant and

Auger were returning to Auger's car, the defendant also placed in the garbage bag the gray jacket that he had been wearing when Auger picked him up.

As directed by the defendant, Auger then drove to a dirt turnaround on Litchfield Avenue in Killingly. The defendant removed from the car the garbage bag containing his clothes, walked a short distance into a wooded area and set fire to the garbage bag.[3] Auger waited for the defendant to return to the car, then drove him to the Burger King in Dayville. The defendant remained at the Burger King, and Auger returned home.

Meanwhile, Gary Kazmer and Jennifer Simoniello were traveling on Holmes Road at approximately 8 p.m. when they noticed the victim's car on the side of the road, approximately 0.3 miles from the intersection with Wrights Crossing Road. The driver's side tires of the car were on the road, while the passenger's side tires were off the road in swamp-like water. As Kazmer and Simoniello passed the car, they saw that the headlights and interior lights were on, and that the driver's side window had been broken. They did not see anyone in the vehicle. Rather than stopping to investigate, Kazmer and Simoniello proceeded to a home on Wrights Crossing Road, where Simoniello requested to use the telephone. Simoniello placed the initial 911 call at 8:06 p.m.

The residents of the home, Jennifer Rosen and Douglas Rosen, then decided to drive to the location of the victim's car. Upon arrival at the scene, they noticed that the engine was running, the windshield wipers, headlights and interior lights were all on, the driver's

---

[3] On April 10, 2001, two days after the victim's murder, Auger directed Todd Stevens, a state police trooper, and Norman Nault, a state police detective, to the location of the partially burned garbage bag. The officers located the defendant's partially burned jacket, blue jeans and boots. Two of the three latent fingerprints found on the remnants of the garbage bag were made by the defendant. The victim's blood was detected on the left front shoulder area, left back sleeve area and left front side of the jacket.

side window had a hole in it and the glass was shattered, and the passenger's side door was open. They also saw the unresponsive victim seated in the driver's seat and laying over to the right in the passenger's seat. The Rosens placed a second 911 call at 8:23 p.m.

While the Rosens were still at the scene, Laurie Blanchette and Mark Racine stopped and observed the same circumstances. Blanchette and Racine donned gloves and attempted to determine if the victim was alive. After being unable to detect a pulse and noting that the victim was not breathing, Blanchette and Racine placed a third 911 call at 8:29 p.m. When Daniel Bavosi, a state police trooper, arrived at the scene at 8:34 p.m., he noted that the victim had been shot and had no pulse.

The forensic evidence revealed that the victim had sustained three gunshot wounds. She first had been shot in the right side of her face, by her nose, from a distance of two to four inches, while driving her car in an easterly direction on Holmes Road. After she had moved slightly forward and to the left, the second shot had entered the back of her head and had come to rest in her brain. Once the vehicle had rolled to a stop in the swampy water, she had fallen to her right over the center console. The shooter then had exited the passenger's side of the vehicle and had attempted to open the driver's side door, which had been locked. The third shot had been fired through the driver's side window into the victim's back, and the bullet had come to rest in the victim's chest.

At 9:28 p.m., as Richard Woods, a state police trooper, was preparing to set up a checkpoint near the intersection of Wrights Crossing Road and Holmes Road, he pursued and stopped a car occupied by Robert Thoren, Audrea Beauregard and the defendant. The defendant had met Thoren and Beauregard at the Burger King in

Dayville, where Auger had left him, and had asked them for a ride. The defendant had then directed them to Wrights Crossing Road. On the way to Wrights Crossing Road, Beauregard had overheard the defendant say, " 'I have to find my gun.' "[4] Woods wrote down the names of all three vehicle occupants and permitted them to leave.

Thoren then drove the defendant to Putnam and dropped him off. The defendant called Auger from Putnam, and she picked him up and took him to his apartment before going to a friend's apartment in Willimantic for the night.

Sometime after midnight, Frank Paparelli, a state police trooper who was driving near the defendant's apartment and had been advised at roll call that the police wanted to question the defendant, observed the defendant. Upon seeing Paparelli, the defendant proceeded into his apartment and began playing loud music. The defendant initially refused to respond when police officers attempted to speak with him but eventually allowed Sergeant John Turner and Detective Richard Bedard of the state police into his apartment at approximately 2:30 a.m., after calling Auger to find out if she knew why the police were outside his apartment.

The officers informed the defendant that the victim's body had been found and questioned him about his whereabouts that day. When the officers began confronting the defendant about inconsistencies in his story, he terminated the interview and, at approximately 3:30 a.m., he left with Cahoon, whom he had called earlier. Cahoon dropped him off in Putnam.

At approximately 5:45 a.m. on April 9, 2001, state police Detectives Charles Sarant and David LeBlanc

[4] On April 11, 2001, three days after the murder, the police found a .22 caliber handgun belonging to the defendant in a wooded area approximately ninety feet west of Wrights Crossing Road. The three bullets removed from the victim had been fired from the handgun, and the victim's blood was found on the handgun.

proceeded to Auger's home to interview her. Auger's father informed the detectives that she was not at the residence. He then called her workplace to inform her that the two detectives were at the home and would like to interview her. Auger told him that she would leave work and return home to speak with the detectives.

Before leaving work, Auger called the defendant to notify him that the detectives were at her house. The defendant responded that he was coming to her workplace. As Auger started to drive away from her workplace, she saw the defendant arrive in a vehicle driven by an unknown female. The defendant got into Auger's car and prevented her from going home by repeatedly shifting the transmission to "park." The defendant proceeded to hit Auger in the head several times and to choke her. He also told her not to leave his side when she spoke with the detectives. Approximately thirty minutes after telling her father that she would return home, Auger called her father from a Dunkin' Donuts in Brooklyn to say that she could not come home. When Auger's father notified the two detectives of her location, they proceeded to the Dunkin' Donuts.

Upon their arrival at the Dunkin' Donuts, the detectives observed that Auger was in her car with the defendant. When they approached the car and identified themselves as detectives, Auger got out of the car. She told Sarant that she was willing to speak with him, but that the defendant was acting crazy and had choked her. Meanwhile, the defendant was yelling for Auger to get back into the car and that she did not have to speak to the detectives. LeBlanc informed the defendant that he was interfering with an investigation and was going to be placed under arrest. LeBlanc then attempted to remove the defendant from the vehicle, at which time the defendant began fighting with him. While Sarant assisted LeBlanc in trying to subdue the defendant,

Auger returned to her car and drove away. The detectives eventually subdued the defendant, sustaining some abrasions and bruising in the process; the defendant sustained a laceration to the top of his head that required stitches.

The state filed charges against the defendant in two separate amended informations that were joined for trial. The first information contained one count of murder associated with the death of the victim. The second information contained two counts of assault of a peace officer associated with the defendant's altercation with Sarant and LeBlanc, and one count of intimidating a witness associated with the defendant's actions with respect to Auger on the day after the murder. The defendant was tried before a jury and found guilty on all of the charges. The trial court sentenced the defendant to imprisonment for life for the murder conviction, two consecutive terms of five years imprisonment for the convictions for assault of a peace officer, and a consecutive term of five years imprisonment for the conviction for intimidating a witness. Additional facts will be set forth as necessary.

I

HEARSAY STATEMENTS

The defendant, on appeal, first claims that the trial court improperly admitted testimony from five separate witnesses concerning statements made by the victim to the effect that she feared the defendant. The defendant argues that the admission of each statement constitutes an independent basis for reversal of his conviction under two separate, but related, theories: (1) the admission of the statements violated certain evidentiary rules codified in the Connecticut Code of Evidence; and (2) the admission of the statements violated the defendant's

federal constitutional right[5] to confront the witnesses against him under the sixth amendment to the United States constitution[6] as applied to the states through the fourteenth amendment to the United States constitution.[7] We disagree.

## A

## Evidentiary Claims

We first address the defendant's evidentiary claims. The defendant contends that each witness' testimony concerning the victim's statements was inadmissible hearsay because it failed to satisfy one or more of the requirements of the exception for statements of the declarant's state of mind. We disagree.

"[A]n out-of-court statement that is offered to establish the truth of the matter asserted is inadmissible hearsay unless the statement falls within a recognized exception to the hearsay rule. . . . One such exception provides that statements expressing a declarant's present state of mind may be offered for the truth of the matter asserted, if relevant."[8] (Citation omitted; internal

[5] "Although the defendant also claims deprivation of his rights under the state constitution, he has failed to provide any independent analysis of the issues pursuant to the state constitution. Accordingly, we limit our analysis to those guarantees provided in the federal constitution." *State* v. *DeJesus*, 270 Conn. 826, 834 n.14, 856 A.2d 345 (2004).

[6] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

[7] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[8] Section 8-3 (4) of the Connecticut Code of Evidence recognizes as an exception to the hearsay rule "[a] statement of the declarant's then-existing mental or emotional condition . . . provided that the statement is a natural expression of the condition and is not a statement of memory or belief to prove the fact remembered or believed." "Section 8-3 (4) embodies what is frequently referred to as the 'state-of-mind' exception to the hearsay rule." Conn. Code Evid. § 8-3 (4), commentary.

quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 355–56, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003).

Evidence is relevant when it has a logical tendency to aid the trier of fact in deciding an issue that is material to the determination of the proceeding. See *State* v. *Wargo*, 255 Conn. 113, 123–24, 763 A.2d 1 (2000); Conn. Code Evid. § 4-1. It is well established in our jurisprudence that, where a marital or romantic relationship existed between a homicide victim and the defendant, evidence of the victim's fear of the defendant suggests a deterioration of that relationship, which is relevant to the issues of motive and intent. *State* v. *Hull*, 210 Conn. 481, 502, 556 A.2d 154 (1989); *State* v. *Thomas*, 205 Conn. 279, 285–86, 533 A.2d 553 (1987). This view finds support in the case law of multiple jurisdictions as well as common experience. See *Gattis* v. *State*, 637 A.2d 808, 818 (Del.) ("[i]n a prosecution for homicide arising out of a marital or romantic relationship, evidence of previous discord between the victim and the defendant is clearly material to issues of motive and intent"), cert. denied, 513 U.S. 843, 115 S. Ct. 132, 130 L. Ed. 2d 75 (1994); *Commonwealth* v. *Borodine*, 371 Mass. 1, 8, 353 N.E.2d 649 (1976) ("[e]vidence of a poor marital relationship between a victim and a defendant is admissible to show the defendant's motive for the murder of his spouse"), cert. denied, 429 U.S. 1049, 97 S. Ct. 760, 50 L. Ed. 2d 765 (1977); *People* v. *Fisher*, 449 Mich. 441, 453, 537 N.W.2d 577 (1995) ("[i]n fact, numerous prior cases have upheld the admissibility of evidence showing marital discord as a motive for murder, or as circumstantial evidence of premeditation and deliberation").

In addition to being relevant to prove the state's theory of the case, evidence that a homicide victim feared the defendant may also be relevant to rebut the defense's theory of the case. "A defendant's articulated

or implied theory of defense may make the victim's state of mind material to the determination of the defendant's guilt or innocence. . . . Indeed . . . this court has not limited the use of the victim's state of mind to affirmative defenses recognized by law, such as self-defense or suicide . . . . Rather, we have permit[ted] its use to rebut *theories* of defense, such as a claim of innocence. . . . Moreover, we have approved the use of testimony about a victim's expressions of fear of the accused when such evidence helps to rebut aspects of [an] asserted defense." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Wargo*, supra, 255 Conn. 139 n.23.

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value. . . . We acknowledge the heightened potential for prejudice in cases such as this, in which the evidence considered is from the voice of the victim. As we have recognized, a real risk of prejudice exists in allowing surrogates to speak for the victim pointing back from the grave. . . . Because of that risk, trial courts must take special care in evaluating the relevance of such evidence and in weighing its probative value and prejudicial effect." (Citations omitted; internal quotation marks omitted.) *State* v. *Dehaney*, supra, 261 Conn. 357–58. "[B]ecause of the difficulties inherent in this balancing process [however] . . . every reasonable presumption should

be given in favor of the trial court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) Id., 358.

With these principles in mind, we now turn to the challenged evidence in the present case. Although the defendant relies on some of the same arguments in challenging each witness' testimony, other arguments are sufficiently distinct to warrant consideration of each challenge on an individual basis. Accordingly, we consider the testimony of each witness in turn in light of the applicable standard of review for evidentiary claims. "Unless an evidentiary ruling involves a clear misconception of the law, [t]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling . . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Aaron L.*, 272 Conn. 798, 811, 865 A.2d 1135 (2005).

## 1

### Testimony of Patricia Ross

We first consider the testimony of Patricia Ross. Prior to Ross' testimony, the defendant requested that the trial court instruct the state to avoid certain incidents of the defendant's bad conduct, especially where those incidents required hearsay testimony from the witness. The state responded that it did not intend to ask Ross about those incidents, but that it did "intend to elicit from [Ross] statements by the victim . . . that she was afraid of the defendant and that she was afraid the defendant was going to kill her. That is relevant. It

shows her state of mind." In response, the defendant argued that the testimony would be unduly prejudicial. The trial court ruled that it would permit evidence of the victim's state of mind as a recognized exception to the hearsay rule but would not permit collateral facts that supported the state of mind.

On the stand, Ross testified that, upon returning home from driving the defendant to his apartment on the morning preceding the day the victim was murdered, she appeared "[s]cared, upset." When the state attempted to elicit what the victim had said with respect to why she was afraid, the defendant objected to the question as calling for hearsay. After the trial court indicated that it had already ruled on the objection and would allow the testimony, Ross stated that the victim had said, " '[m]om, I'm afraid he was going to kill me.' " Ross further testified that she understood the victim to be referring to the defendant.

The defendant argues that the trial court improperly admitted Ross' testimony under the state of mind exception to the hearsay rule for the following reasons: (1) the victim's use of "was" indicates that the statement did not evince a *then existing* state of mind; (2) the statement referred to facts or events and included the reasons for the state of mind because it referred to the incident earlier that morning between the victim and the defendant; (3) the statement was not a natural expression of the victim's condition because Ross initiated the conversation; (4) the statement was not introduced exclusively for the victim's state of mind because that state of mind did not affect her actions; (5) the victim's fear of the defendant was irrelevant to the case because it did not relate to any defense claim or provide context to any relevant action of the victim; and (6) admission was more prejudicial to the defendant than probative of any relevant issue. We disagree.

It was within the trial court's discretion to conclude that the victim's statement referred to her then existing state of mind, especially in light of Ross' own observation that the victim appeared "scared" and "upset" when the statement was made. Moreover, although the state of mind exception does not encompass statements pointing to acts of another as the cause of the declarant's state of mind; *State* v. *Dehaney*, supra, 261 Conn. 359–60; the victim's statement, "[m]om, I'm afraid he was going to kill me," contains no reference to an act of the defendant or the cause of the victim's fear. The prohibition against the declarant's statement containing the cause of her state of mind does not preclude admissibility of that statement under the state of mind exception to the hearsay rule just because the party offering the statement previously offered evidence that would induce that state of mind. In other words, Ross' testimony concerning the victim's statement was not made inadmissible by Ross' previous testimony concerning what she witnessed in the victim's bedroom earlier that morning.

Nor was the statement inadmissible because Ross initiated the conversation. Generally, to be admissible, an out-of-court statement introduced to establish the declarant's state of mind must be "made in a natural manner, in apparent good faith and without reason for fabrication . . . [and] offered exclusively as evidence of the declarant's state of mind." (Citations omitted; internal quotation marks omitted.) *State* v. *Bova*, 240 Conn. 210, 238, 690 A.2d 1370 (1997). Nothing in Ross' testimony suggests that the victim's statement was not made in a natural manner during a conversation between a mother and a daughter, regardless of which of the participants initiated the conversation. The state indicated that the evidence was offered to show the victim's state of mind, namely, fear of the defendant. No requirement exists that the state prove actions on

the part of the victim in conformity with that state of mind as long as it is relevant to some issue in the case.

As stated previously in this opinion, we have consistently held that evidence of deterioration in a marital or romantic relationship, such as a victim's fear of the defendant, is relevant to motive and intent in a homicide prosecution and may be relevant to rebut the defense's theory of the case. In the present case, the victim's expressions of fear of the defendant were relevant to show the deterioration in their romantic relationship. The defendant contends that the victim's fear was not relevant to motive because her statement was not made in the defendant's presence, nor was there obvious evidence of a deteriorated relationship. The defendant also contends that the state did not argue the deterioration in the relationship as the defendant's motive for murdering the victim; rather, the state argued that the defendant's motive was control. We conclude that the jury properly could have inferred that the defendant was aware that the relationship had deteriorated from the victim's multiple expressions of fear and other evidence that the relationship had deteriorated, namely, the argument between the two less than forty-eight hours before the homicide and the defendant's statement to Auger that he would shoot the victim in the head, and that the defendant's resulting fear that he would lose the ability to control the victim provided his motive to commit the murder. Moreover, one of the defendant's implied theories of defense was that it was Auger, not he, who had the motive to kill the victim. This made evidence of the victim's fear relevant. Considering the probative value of this evidence, the trial court did not abuse its discretion in deciding that the evidence was more probative than prejudicial. Finally, any potential prejudice was mitigated by the trial court's limiting instructions to the jury.[9]

---

[9] The trial court charged the jury in relevant part: "This has to do with limited admission of evidence. If some evidence was admitted for a limited

2

## Testimony of Jeffrey Dailey

We next consider the testimony of Jeffrey Dailey, the defendant's cousin and a friend of the victim. During direct examination of Dailey, the state asked, "Did [the victim] ever say anything to you about being scared at all?" The defendant objected to the question as calling for hearsay. The state maintained that the state of mind exception applied, and the trial court overruled the objection. The following exchange then took place between the state and Dailey:

"Q. Did [the victim] indicate to you anything about being scared in the past when you knew her?

"A. Yeah, she said it one time. Just once.

"Q. What did she say?

"A. She just said that she was afra—you know, I mean, she didn't—she was just afraid of how he was acting. You know what I mean? Once in a while.

"Q. Of who?

"A. How [the defendant] was acting once in a while."

The defendant argues that the trial court improperly admitted Dailey's testimony under the state of mind exception to the hearsay rule for the following reasons: (1) the statement "was about facts or events"; (2) the statement contained "the cause or reason for the state

purpose, you should only consider that evidence for that purpose. You heard several witnesses testify to statements made by [the victim] concerning her fear of the defendant. This type of testimony, which is not normally allowed because it's hearsay evidence, was allowed under the circumstances for a limited purpose only. It was not allowed certainly to prove the truth of what she said, but merely to show what [the victim's] state of mind was at the time as it related to her fears. A statement of a person's then existing mental or emotional condition is allowed into evidence as an exception to the hearsay rule."

of mind"; (3) the statement was not presented exclusively as evidence of the victim's state of mind because, although it "touched on" the victim's state of mind, it also established that the defendant did something to cause her to be fearful; (4) the victim's state of mind was irrelevant to any material issue in the case; and (5) the evidence was more prejudicial than probative.[10] We disagree.

Dailey's testimony that the victim stated that "she was just afraid of how he was acting," contains no reference to specific facts or events involving the defendant that caused the victim's state of mind. In *State* v. *Dehaney,* supra, 261 Conn. 359, we concluded that those portions of an affidavit filed by the homicide victim in support of her request for an ex parte restraining order against the defendant that referred to specific acts of alleged prior misconduct by the defendant were inadmissible "because they [were] statement[s] of memory or belief to prove the fact remembered or believed." (Internal quotation marks omitted.) The inadmissible portion of the affidavit included statements such as, "I

[10] Although the defendant did not object to the evidence as irrelevant at the time it was offered, he subsequently filed a motion to strike and for curative instructions in which he requested that all of the testimony regarding statements made by the victim to the effect that she feared the defendant be stricken as evidence, and that the trial court remedy the erroneous admission of the evidence by a curative instruction at the time it struck the evidence and during the charge to the jury. In that motion, the defendant argued, inter alia, that the mental state of the victim was irrelevant. Following the verdict, the defendant filed a motion for a new trial in which he again raised the issue of the victim's statements and offered additional grounds for excluding the evidence not offered at trial or in the motion to strike and for curative instructions. A party cannot preserve grounds for reversing a trial court decision by raising them for the first time in a postverdict motion. See *Travelers Ins. Co.* v. *Namerow,* 257 Conn. 812, 832 n.15, 778 A.2d 168 (2001). We conclude, however, that the defendant did preserve the lack of relevance as a ground for excluding the evidence by raising it in the motion to strike and for curative instructions while there was still time for the court to correct any error before the completion of the trial. Furthermore, the state does not claim that this ground was unpreserved.

am physically abused at least once a month and verbally abused daily"; id., 353; and "[a]t least once a month, my husband starts fights with me." (Internal quotation marks omitted.) Id. In the present case, Dailey's testimony contains no such statements of memory or belief by the victim, nor does the victim's statement refer to any specific act of the defendant that caused her to be fearful. Thus, the defendant's argument that the statement was not offered exclusively for the victim's state of mind also fails. The defendant's remaining arguments fail for the reasons discussed in part I A 1 of this opinion.

### 3

### Testimony of Tia Daviau

We next consider the testimony of Tia Daviau, a coworker of the victim. During direct examination of Daviau, the state attempted to elicit what the victim had told Daviau, during conversations between the two in the three weeks prior to the victim's death, about how she felt about the defendant. The defendant objected to the line of inquiry several times on relevance and hearsay grounds. The state countered that the testimony was relevant and fell under the state of mind exception to the hearsay rule, and that it had "been argued and ruled on before by the court." After the trial court overruled the objection, Daviau testified that "[the victim] was frighten of [the defendant]."

The defendant argues that the trial court improperly admitted Daviau's testimony under the state of mind exception to the hearsay rule because the state's question was not limited exclusively to the victim's state of mind; rather, it referred to how the victim felt about the defendant. The defendant also argues that the evidence was irrelevant. We disagree.

Daviau's response to the state's question went directly to the state of mind of the victim, namely, fear

of the defendant. The evidence was offered to establish that state of mind. As discussed in part I A 1 of this opinion, the victim's fear of the defendant tended to show a deterioration in the relationship and to rebut the defendant's implied theory of defense, which were relevant to the issues in the case.

### 4

### Testimony of Peter Ouellette

We next consider the testimony of Peter Ouellette, the boyfriend of the victim's mother at the time of the murder. During the state's direct examination of Ouellette, the following exchange took place:

"Q. And the few weeks prior to [the victim] being murdered, did she ever express to you her state of mind towards the defendant?

"A. Yes.

"Q. What did she tell you?

"A. That sometimes she was afraid when she was around him.

"Q. Excuse me.

"A. That she was afraid when she was around him."

The defendant did not object to this testimony at the time it was offered but did request that it be stricken in his motion to strike and for a curative instruction. See footnote 10 of this opinion. The defendant argues that the trial court improperly admitted Ouellette's testimony because: (1) doubt exists as to whether the victim expressed a present state of mind; (2) the testimony failed to describe a constant state of mind; (3) the victim's state of mind was not relevant; and (4) the evidence was more prejudicial than probative. We disagree.

The defendant contends that the lack of an explanation of the circumstances surrounding the victim's statements, in conjunction with Ouellette's testimony that the victim experienced fear "sometimes" and "when she was around [the defendant]," makes it questionable whether the victim expressed a present state of mind. Although the wording of Ouellette's testimony may raise doubts as to whether the victim expressed a present state of mind, we cannot say that it was a clear abuse of the trial court's discretion to determine that she had done so.

The defendant also contends that, because the only value of the victim's state of mind was to explain the victim's actions or motives, testimony that she was afraid only "sometimes" or only "when she was around [the defendant]," was irrelevant because her state of mind was not constant. As explained in part I A 1 of this opinion, however, the evidence was relevant to explain the defendant's motive and to rebut the defendant's defense, regardless of whether it helped explain the victim's actions or motives. The defendant's argument that the evidence was more prejudicial than probative also fails for the reasons explained in part I A 1 of this opinion.

5

Testimony of Tyrus Hines

Finally, we consider the testimony of Tyrus Hines, a friend of both the victim and the defendant. The defendant challenges the admissibility of two separate portions of Hines' testimony. First, the defendant challenges portions of the following exchange between the state and Hines:

"Q. Did [the victim] state to you in the time leading up to her murder her state of mind regarding [the defendant]?

"A. Not really. She just—basically, she was—she wanted to get away from him, like. She ain't want to be around him, be with him no more.

"Q. Did she say why she needed to do that? What her state of mind was?

"A. Why she needed to do it? She never really said why. She just—they was arguin', fightin', I guess.

"Q. I can't hear you, sir.

"A. They were arguin', fightin', I guess. Arguing a lot."

To refresh his recollection, Hines was then shown a copy of a statement he had given the police. Afterwards, the following exchange occurred between the state and Hines:

"Q. Does that refresh your recollection about what [the victim] said to you?

"A. Yeah.

"Q. What did she say to you?

"A. She said—at what point? Basically, she was scared.

"Q. How does she describe her being scared? What was she scared of?

"A. Of [the defendant] killin' her mother and brother.

"Q. Excuse me.

"A. Of [the defendant]. She was scared of [the defendant].

"Q. [The defendant] doing what?

"A. Killin' her, her mother or brother, or even her."

The defendant did not object to this testimony at the time it was offered but did request that it be stricken in his motion to strike and for a curative instruction.

See footnote 10 of this opinion. The defendant argues that the trial court improperly admitted the evidence for the following reasons: (1) the testimony stated the reason for the victim's state of mind; (2) the declaration was a reference to past events and was an implied accusation of the defendant; (3) the victim's fear was irrelevant; and (4) the evidence was more prejudicial than probative. We disagree.

The defendant contends that the state improperly asked for the reason that the victim wanted to get away from the defendant, and that Hines' response that "they was arguin,' fightin,' I guess," improperly supplied that reason. In light of Hines' statement that "[s]he never really said why" immediately preceding that response, however, it was within the trial court's discretion to conclude that the challenged response was nothing more than speculation on Hines' part, rather than a statement made by the victim. The defendant also contends that the state asked for the reason for the victim's state of mind by asking "What was [the victim] scared of?" The state's question was not, "why was the victim scared," which would have been a request for the reason for the victim's state of mind. Furthermore, the witness' response did not refer to any specific act of the defendant as the reason for the victim's fear. See part I A 2 of this opinion. Nor can we discern any reference to past events or an implied accusation of the defendant in the statements of the victim. The evidence was relevant and more probative than prejudicial for the reasons explained in part I A 1 of this opinion. Although the defendant now refers to Hines' testimony as "shocking," his failure to object at the time the testimony was offered leaves us with the impression that the testimony was less shocking than the defendant would have us now believe. Certainly, it was not an abuse of the trial court's discretion to refuse to strike the testimony when the defendant subsequently requested that it do so.

The defendant also challenges the admissibility of two voice mail messages left on Hines' cellular telephone by the victim on the day she was murdered. The messages were introduced, as follows, during Hines' testimony in both voice and transcript form:

"Elizabeth, um, give me a call, I'm at my house now. Um, cause I've got to leave here soon or something, because I don't trust him. He keeps calling me trying to find out where the fuck I'm at, so give me a call like as soon as you can. Bye."

"Tyrus, it's Elizabeth, give me a call as soon as possible. I'm trying to get ahold of you and you're not picking up your phone, um? This little shit is go'n on. I can't even, I'm like not at my house right now because I can't be at my house right now, so give me a call when you get this message."

When the state initially offered the voice recording into evidence, the defendant objected as follows: "Your Honor, no probative value whatsoever. Not relevant. Got nothing at all to do with anything that my client may or may not have done. It's the victim's phone calls to Mr. Hines. My client is not identified. There's a reference to 'him.' There's a reference that she can't hang out at her house. . . . There's a reference to 'him' or 'he' and a reference to the fact that she can't hang out at her own house. Nothing tying my client to anything. I would object based on relevance and lack of probative value." After the state responded that the victim's state of mind could be inferred from her statements and was relevant, the trial court admitted the recording into evidence with the instruction that it was "offered to show the state of mind of the victim."

The defendant argues that the trial court improperly admitted the evidence for the following reasons: (1) the messages contained facts and events; (2) the messages contained the reason for the victim's state of mind; (3)

the evidence was not offered exclusively to show the victim's state of mind; (4) the victim's state of mind was irrelevant; and (5) the evidence was more prejudicial than probative. We disagree.

The defendant contends that the victim's references to being at her home and to the defendant's repeated telephone calls in the first message and to "[t]his little shit . . . go'n on" in the second message make the messages inadmissible under our holding in *State* v. *Dehaney*, supra, 261 Conn. 359. The defendant misinterprets the holding in *Dehaney*. As discussed in part I A 2 of this opinion, we concluded that the statements of facts and events in the *Dehaney* affidavit were inadmissible because they "referred . . . to specific acts of alleged prior misconduct by the defendant." Id. The messages in the present case do not refer to similar acts on the part of this defendant.

The defendant's arguments concerning exclusivity and relevance are consistent with the arguments he made with respect to Ross' testimony, and we reject those arguments for the same reasons discussed in part I A 1 of this opinion. The defendant also contends that this evidence was particularly prejudicial because the recordings were of the victim's voice only hours before her death, resulting in a greater emotional impact on the jury. The trial court had the opportunity to hear the voice messages and to gauge their emotional impact on the jury. We cannot say that it was an abuse of the trial court's discretion to determine that the evidence was more probative than prejudicial in this instance.

B

Constitutional Claims

We next address the defendant's constitutional claims. The defendant contends that the testimony concerning the victim's statements violated the confronta-

tion clause of the sixth amendment because it lacked " 'particularized guarantees of trustworthiness.' " *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), overruled in part, *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). We conclude that, because the testimony fell under the state of mind exception to the hearsay rule, which is a "firmly rooted" exception under federal law, admission of the testimony was constitutional.

The conclusion that evidence is admissible under a hearsay exception does not preclude the possibility, in a criminal trial, that the same evidence will be inadmissible under the confrontation clause of the sixth amendment. The confrontation clause limits the state's use of hearsay evidence against a criminal defendant at trial. *State v. Aaron L.*, supra, 272 Conn. 812. Although "the confrontation clause does not erect a per se bar to the admission of hearsay statements against criminal defendants . . . [it] bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." (Citations omitted; internal quotation marks omitted.) Id., 812–13. Hearsay evidence satisfies the confrontation clause's strictures for admissibility if "(1) the evidence falls within a firmly rooted hearsay exception or (2) it contains particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to the statements' reliability." (Internal quotation marks omitted.) *Lilly v. Virginia*, 527 U.S. 116, 124–25, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999), quoting *Ohio v. Roberts*, supra, 448 U.S. 66.[11]

---

[11] "In *State v. Rivera*, 268 Conn. 351, 362–64, 844 A.2d 191 (2004), we recognized that the United States Supreme Court overruled *Roberts* to the extent that it applied to 'testimonial' hearsay statements. See *Crawford v. Washington*, [supra, 541 U.S. 36]. In reaching its conclusion, the Supreme Court drew a distinction between testimonial hearsay statements and those deemed nontestimonial. Id., 50–51. Although the court declined to define the terms 'testimonial' and 'nontestimonial,' it considered three core classes of testimonial statements. Id., 50–53. These classes include: (1) ex parte in-

State law governs whether evidence falls within an exception to the hearsay rule, but federal law governs whether that exception is " 'firmly rooted' " for confrontation clause purposes. *Lilly* v. *Virginia*, supra, 527 U.S. 125. Because we concluded, in part I A of this opinion, that the victim's statements fell within the state of mind exception to the hearsay rule, we now examine federal law to determine whether that exception is "firmly rooted" for confrontation clause purposes.

court testimony or its functional equivalent; (2) extrajudicial statements contained in formalized testimonial materials; and (3) statements that were made under circumstances which would lead an objective witness reasonably to believe that the statements would be available for use later at trial. Id." *State* v. *Aaron L.*, supra, 272 Conn. 813 n.21.

The challenged statements in the present case do not fall within any of the classes of testimonial statements discussed by the court in *Crawford*. Accordingly, application of the test established in *Roberts* is appropriate. Id.

We also note that *Ohio* v. *Roberts*, supra, 448 U.S. 65, established a requirement that the declarant be unavailable for the hearsay evidence to be admissible. Although we have consistently included unavailability as a requirement in our references to the *Roberts* test in the past; see, e.g., *State* v. *Aaron L.*, supra, 272 Conn. 813; *State* v. *Schiappa*, 248 Conn. 132, 158, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999); *State* v. *Outlaw*, 216 Conn. 492, 505, 582 A.2d 751 (1990); we recognize that several United States Supreme Court cases following *Roberts* call into question whether unavailability is a requirement when the challenged out-of-court statements are not made in the course of a prior judicial proceeding. See, e.g., *United States* v. *Inadi*, 475 U.S. 387, 394, 106 S. Ct. 1121, 89 L. Ed. 2d 390 (1986) ("*Roberts* must be read consistently with the question it answered, the authority it cited, and its own facts. All of these indicate that *Roberts* simply reaffirmed a longstanding rule, foreshadowed in *Pointer* v. *Texas*, 380 U.S. 400 [85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965)], established in *Barber* [v. *Page*, 390 U.S. 719, 88 S. Ct. 1318, 20 L. Ed. 2d 255 (1968)], and refined in a line of cases up through *Roberts*, that applies unavailability analysis to prior testimony. *Roberts* cannot fairly be read to stand for the radical proposition that no out-of-court statement can be introduced by the government without a showing that the declarant is unavailable."); *White* v. *Illinois*, 502 U.S. 346, 354, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992) ("[s]o understood, *Roberts* stands for the proposition that unavailability analysis is a necessary part of the [c]onfrontation [c]lause inquiry only when the challenged out-of-court statements were made in the course of a prior judicial proceeding"). Because unavailability is not an issue in the present case, we leave the question of when unavailability is required to satisfy the confrontation clause to a future case when it can be fully briefed by the parties.

The United States Supreme Court has not yet considered whether the state of mind exception is "firmly rooted." Therefore, in order to identify the relevant factors for consideration, we examine those instances where it has made that determination for other hearsay exceptions. In general, an exception to the hearsay rule qualifies "as firmly rooted if, in light of longstanding judicial and legislative experience . . . it rest[s] [on] such [a] solid foundatio[n] that admission of virtually any evidence within [it] comports with the substance of the constitutional protection." (Citation omitted; internal quotation marks omitted.) Id., 126. In determining whether a hearsay exception is "firmly rooted," the Supreme Court has considered the following factors: (1) the length of time the exception has been recognized;[12] (2) whether it has been incorporated in the Federal Rules of Evidence;[13] and (3) its acceptance among the states.[14]

Applying these factors to the state of mind exception to the hearsay rule, we conclude that it is "firmly rooted" for confrontation clause purposes. The state of mind exception has been recognized by the Supreme Court since its decision in *Mutual Life Ins. Co.* v. *Hillmon*,

[12] See *Lilly* v. *Virginia*, supra, 527 U.S. 130 (statements against penal interest consisting of accomplices' confessions that inculpate criminal defendant not within "firmly rooted" exception to hearsay rule where "[t]he practice of admitting statements in this category under an exception to the hearsay rule . . . is . . . of quite recent vintage"); *White* v. *Illinois*, 502 U.S. 346, 355 n.8, 112 S. Ct. 376, 116 L. Ed. 2d 848 (1992) (hearsay exception for spontaneous utterance " 'firmly rooted' " where it "is at least two centuries old . . . and may date to the late 17th century" [citation omitted]); *Bourjaily* v. *United States*, 483 U.S. 171, 183, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987) (hearsay exception for coconspirator's statements " 'firmly rooted' " where it "was first established in [the Supreme] Court over a century and a half ago").

[13] See *White* v. *Illinois*, 502 U.S. 346, 355 n.8, 112 S. Ct. 376, 116 L. Ed. 2d 848 (1992).

[14] See *White* v. *Illinois*, 502 U.S. 346, 355 n.8, 112 S. Ct. 376, 116 L. Ed. 2d 848 (1992).

145 U.S. 285, 295–96, 12 S. Ct. 909, 36 L. Ed. 706 (1892), more than one century ago. Moreover, the exception has been codified as rule 803 (4) of the Federal Rules of Evidence and "exists in every jurisdiction in the country, whether by statute, court rule, or common law tradition." *Hayes* v. *York*, 311 F.3d 321, 325 (4th Cir. 2002), cert. denied, 538 U.S. 979, 123 S. Ct. 1803, 155 L. Ed. 2d 669 (2003). Not surprisingly, every federal circuit that has considered the issue, including the United States Court of Appeals for the Second Circuit,[15] has concluded that the state of mind exception is "firmly rooted" for confrontation clause purposes. See, e.g., *Horton* v. *Allen*, 370 F.3d 75, 85 (1st Cir. 2004), cert. denied, 543 U.S. 1093, 125 S. Ct. 971, 160 L. Ed. 2d 905 (2005); *Hayes* v. *York*, supra, 326; *Moore* v. *Reynolds*, 153 F.3d 1086, 1107 (10th Cir. 1998), cert. denied, 526 U.S. 1025, 119 S. Ct. 1266, 143 L. Ed. 2d 362 (1999); *Terrovona* v. *Kincheloe*, 852 F.2d 424, 427 (9th Cir. 1988); *Barber* v. *Scully*, 731 F.2d 1073, 1075 (2d Cir. 1984); *Lenza* v. *Wyrick*, 665 F.2d 804, 811 (8th Cir. 1981).

The defendant asserts that we should assess the evidence in the present case against the *Roberts* standard of "particularized guarantees of trustworthiness"; *Ohio* v. *Roberts*, supra, 448 U.S. 66; because the state of mind exception, as applied to declarations made by the victim in a homicide case, is not "firmly rooted." That application of the exception, he argues, has not enjoyed consistent admissibility and has been examined on a case-by-case basis since the Supreme Court restricted its use in *Shepard* v. *United States*, 290 U.S. 96, 54 S. Ct. 22, 78 L. Ed. 2d 196 (1933), due to its high probability for prejudice. He also claims that because the exception finds application in a wide range of case types, including probate, civil and criminal cases, it is like the hearsay

---

[15] "Decisions of the Second Circuit Court of Appeals, although not binding on us, are particularly persuasive." *Turner* v. *Frowein*, 253 Conn. 312, 341, 752 A.2d 955 (2000).

exception for admissions against penal interest, which "defines too large a class for meaningful [c]onfrontation [c]lause analysis." (Internal quotation marks omitted.) *Lilly* v. *Virginia,* supra, 527 U.S. 127. We are not persuaded.

In *Shepard,* the victim's husband was convicted of murder after the victim's nurse had testified that the victim, then ill in bed, had stated, " 'Dr. Shepard has poisoned me.' " *Shepard* v. *United States,* supra, 290 U.S. 98. After concluding that the statement was not a dying declaration, the Supreme Court turned to the question of whether the evidence was admissible as indicative of a state of mind inconsistent with suicidal intent to rebut evidence proffered by the defendant that the victim had contemplated suicide. Id., 102. Although the court commented on the potential for prejudice of the evidence; id., 104 ("[t]he reverberating clang of those accusatory words would drown all weaker sounds"); it did not rule that the evidence was inadmissible on that basis, as suggested by the defendant, nor did it restrict the use of the state of mind exception to the hearsay rule as applied to declarations made by the victim in a homicide case. Rather, because the victim's statement faced backward and referred to someone else's actions, the court rejected the argument that the evidence fell under the state of mind exception. Thus, the case is inapposite to whether the state of mind exception is "firmly rooted" other than as further evidence of the Supreme Court's consistent recognition of the exception.

The defendant's second argument is similarly flawed. In *Lilly,* the Supreme Court did not conclude that, in order to perform a meaningful confrontation clause analysis, it had to break down the hearsay exception for statements against penal interest into the three principal situations where such statements are offered into evidence because they are offered in a wide range of

case types. In fact, the court focused solely on admission of such statements in criminal trials. *Lilly* v. *Virginia*, supra, 527 U.S. 127. Hearsay exceptions in federal cases are not limited to distinct case types.[16] Thus, acceptance of the defendant's argument would prevent any hearsay exception from being "firmly rooted." Such a result does not correspond with previous United States Supreme Court jurisprudence.

## II

## JURY CHARGE ON INTENT

The defendant next claims that the trial court erroneously charged the jury concerning the intent element of the murder charge. Specifically, the defendant argues that the trial court's instruction violated his constitutional right to due process by establishing a mandatory presumption that improperly shifted the burden of proof to the defendant and also violated this court's mandate in *State* v. *Aponte*, 259 Conn. 512, 522, 790 A.2d 457 (2002), pursuant to our supervisory authority over the administration of justice, that the trial courts of this state should refrain from using the challenged jury instruction. Because the defendant failed to preserve this claim at trial, he urges us to review the constitutional argument under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[17] and the plain error

---

[16] The hearsay exception for a dying declaration is limited to criminal prosecutions for homicide in Connecticut; see Conn. Code Evid. § 8-6 (2); but not in rule 804 (2) of the Federal Rules of Evidence.

[17] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

doctrine,[18] and under our supervisory authority. The defendant cannot prevail under *Golding*, and, although the challenged instruction violated this court's direction in *Aponte*, we disagree that the violation warrants reversal under either the plain error doctrine or this court's supervisory authority.

A

Constitutional Claim

We first address the defendant's constitutional argument. Our conclusion in *State* v. *Aponte*, supra, 259 Conn. 522, is dispositive of this argument. In *Aponte*, which was also a murder case, the defendant claimed that the following jury instruction violated his due process rights: "An intent to cause death may be inferred from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to it [and] immediately following death. One who uses a deadly weapon on the vital part of another will be deemed to have intended the probable result of that act [and] from such a circumstance a proper inference may be drawn that there was an intent to kill." (Internal quotation marks omitted.) Id., 519–20. The defendant argued that this language "impermissibly shifted to him the burden of proof regarding intent because the charge created a mandatory presumption that he had the intent to kill solely by virtue of his use of a deadly weapon." Id., 520. We concluded that the defendant's *Golding* challenge to the jury instruction failed because it did not satisfy the third prong, namely, that the constitutional violation clearly existed and clearly deprived the defendant of a fair trial. Id., 519. In reaching that conclusion,

---

[18] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

we noted that "the trial court's instruction was qualified, both immediately preceding and following the challenged language, by its use of the permissive may. . . . We have determined previously that the inclusion of such permissive language tempers the challenged portion of the instruction and ensures that a reasonable jury will not interpret the charge in an unconstitutional manner." (Internal quotation marks omitted.) Id., 521.

The challenged jury instruction in the present case is virtually identical to that in *Aponte*. Accordingly, our reasoning in that case applies. In the present case, the trial court instructed the jury as follows: "An intent to cause death *may* be inferred from circumstantial evidence such as a type of weapon used, the manner in which it was used, the type of wound inflicted, and the events leading to it and immediately following the death. One who uses a deadly weapon on the vital part of another will be deemed to have intended the probable result of that act, and from such a circumstance a proper inference *may* be drawn that there was an intent to kill." (Emphasis added.) We can distinguish no substantial difference between the two jury instructions. Indeed, the defendant concedes "that the surrounding language in this case is nearly identical to that in *Aponte*" but requests that we revisit our conclusion that the language satisfies constitutional requirements. We decline to do so.

B

Plain Error

We next address the defendant's argument that the trial court's contravention of this court's direction to discontinue use of the challenged jury instruction warrants reversal under plain error. "The plain error doctrine is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that,

although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . The plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Alston*, 272 Conn. 432, 455–56, 862 A.2d 817 (2005).

The defendant fails to satisfy this difficult burden. We directed the trial courts to discontinue the use of the challenged instruction in *Aponte* because we were concerned that it "could give rise to a danger of juror misunderstanding." *State* v. *Aponte*, supra, 259 Conn. 522. Nevertheless, we are not convinced that the potential danger of misunderstanding in the present case was so significant as to affect the fairness and integrity of or the public confidence in the proceeding, especially where intent was not a contested issue in the case.[19]

## C

### Supervisory Authority

Finally, we address the defendant's argument that the trial court's contravention of this court's direction to discontinue the use of the challenged jury instruction warrants reversal under our supervisory authority. "Historically, the exercise of this court's supervisory powers has been limited to the adoption of judicial procedures required for the fair administration of justice." *State* v. *Higgins*, 265 Conn. 35, 61, 826 A.2d 1126 (2003). "Supervisory powers are exercised to direct trial courts

---

[19] The victim was shot three times, at close range, from different angles, with the first shot occurring while she was driving her vehicle; the intent to cause her death was not in dispute.

to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . [O]ur supervisory authority is not a form of free-floating justice, untethered to legal principle. . . . Rather, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers." (Citations omitted; internal quotation marks omitted.) Id., 61 n.26.

Accordingly, we exercise our supervisory authority sparingly and then, typically, only to provide procedural guidance; see, e.g., *State* v. *Padua*, 273 Conn. 138, 179, 869 A.2d 192 (2005) (reviewing court must address defendant's insufficiency of evidence claim if properly briefed and sufficient record exists); *Duperry* v. *Solnit*, 261 Conn. 309, 329, 803 A.2d 287 (2002) (where defendant pleads not guilty by reason of mental disease or defect, and state substantially agrees with defendant's claim of mental disease or defect, trial court must canvass defendant to ensure plea made voluntarily and with full understanding of consequences); *State* v. *Delvalle*, 250 Conn. 466, 475–76, 736 A.2d 135 (1999) (trial courts should refrain from using " 'ingenuity of counsel' " language in jury charges); *State* v. *Gould*, 241 Conn. 1, 15, 695 A.2d 1022 (1997) (videotaped deposition testimony must be played under supervision of trial judge in open court and in presence of parties and counsel rather than in jury room); not to address common claims of error. "Our supervisory powers are not a last bastion of hope for every untenable appeal. They are an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . In this

context, the supervisory powers serve a narrow purpose. In each case in which we have invoked our supervisory authority, we have acted to provide additional procedural safeguards for some salient aspect of the right to a trial before an impartial jury." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 815, 709 A.2d 522 (1998).

Accordingly, "we do not consider this an appropriate case for the exercise of our supervisory powers." Id., 814. The trial court's failure to heed our direction to discontinue the use of the challenged jury instruction was not such an extraordinary violation that it threatened the integrity of the trial, and it certainly did not rise to the level of implicating the perceived fairness of the judicial system as a whole. The defendant does not suggest that the trial court deliberately disregarded this court's mandate. Nor do we consider a new trial necessary to emphasize the importance of our direction in *Aponte* to the trial courts of this state.

III

JURY CHARGE ON THE PRESUMPTION OF
INNOCENCE AND PROOF BEYOND A
REASONABLE DOUBT

Finally, the defendant claims that the trial court erroneously charged the jury concerning the presumption of innocence and proof beyond a reasonable doubt. Specifically, the defendant argues that the trial court's instruction violated his constitutional right to due process by misleading the jury on its understanding of the presumption of innocence and reasonable doubt standards and also violated this court's mandate in *State* v. *Schiappa*, 248 Conn. 132, 175, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999), pursuant to our supervisory authority over the administration of justice, that the trial courts of this

state should refrain from using the challenged jury instruction. Because the defendant failed to preserve this claim at trial, he seeks to prevail under *State* v. *Golding*, supra, 213 Conn. 239–40; see footnote 17 of this opinion; the plain error doctrine; see footnote 18 of this opinion; and under our supervisory authority. The defendant cannot prevail under *Golding*, and, although the challenged instruction violated this court's direction in *Schiappa*, we disagree that the violation warrants reversal under either the plain error doctrine or this court's supervisory authority.

### A

### Constitutional Claim

We first address the defendant's constitutional argument. Our conclusion in *State* v. *Schiappa*, supra, 248 Conn. 176, is dispositive of this argument. In *Schiappa*, a manslaughter case, the defendant claimed "that the trial court's charge to the jury that the principle requiring the state to establish guilt beyond a reasonable doubt is a 'rule of law . . . made to protect the innocent and not the guilty' impermissibly undermined the presumption of innocence, thereby diluting the state's burden of proof," and, thus, violated her due process rights and her sixth amendment right to a jury trial. Id., 168. We concluded that the defendant's *Golding* challenge to the jury instruction failed because it did not satisfy the third prong, namely, that the constitutional violation clearly existed and clearly deprived the defendant of a fair trial. Id., 176–77. In reaching that conclusion, we noted that the sentences concerning the presumption of innocence that immediately proceeded and immediately followed the challenged instruction,[20]

---

[20] The challenged portion of the instruction was preceded by the following language: "It is the sworn duty of the court and the jurors to safeguard the rights of persons charged with crimes by respecting the presumption of innocence which the law imputes to every person so charged by making the state meet its burden of proof of guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Schiappa*, supra, 248 Conn. 172.

"taken together with the court's repeated explanations of the presumption of innocence and the state's burden of proving the defendant guilty beyond a reasonable doubt, eliminated any reasonable likelihood of juror misunderstanding as to the state's burden and the proof necessary for a conviction." Id., 173.

The defendant concedes that this court has held consistently that language similar to that used in the present case does not violate the defendant's due process rights because of the clarity of other parts of the charge; see *State* v. *Delvalle*, supra, 250 Conn. 472; *State* v. *Schiappa*, supra, 248 Conn. 172; *State* v. *Francis*, 228 Conn. 118, 135, 635 A.2d 762 (1993); but suggests that, because we have stated our support for the holding in *United States* v. *Doyle*, 130 F.3d 523 (2d Cir. 1997), in *Schiappa* and subsequent cases, we should conclude that the same language in this jury charge did violate the defendant's due process rights.

In *Schiappa*, we pointed out that "the court in *Doyle* expressly acknowledged that instructions correctly explaining the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt, when given repeatedly . . . can render a charge in its entirety adequate to avoid reversal, despite inclusion of the objectionable protect-the-innocent language. . . . [Id.] 539." (Internal quotation marks omitted.) *State* v. *Schiappa*, supra, 248 Conn. 174. The trial court's jury charge in the present case contained much of the same language[21] that this court determined, in *Schi-*

It was followed by the following language: "If and when the presumption of innocence has been overcome by evidence proving beyond a reasonable doubt that the accused is guilty of the crime or crimes charged, then it is the sworn duty of the jury to enforce the law and to render verdicts of guilty." (Internal quotation marks omitted.) Id., 172–73.

[21] The trial court's final charge to the jury contained the following language: "I'm going to tell you again about the presumption of innocence that I told you about earlier. In this case, as in all criminal cases, the accused is presumed to be innocent until he is proven guilty. That means at the beginning of the case [the defendant] stood before you free of any bias, prejudice,

*appa,* "eliminated any reasonable likelihood of juror misunderstanding as to the state's burden and the proof necessary for a conviction." Id., 173. For the reasons stated in *Schiappa,* "we see no compelling reason to deviate from our prior constitutional precedent." Id., 172.

## B

## Plain Error

We next address the defendant's argument that the trial court's contravention of this court's direction to

or burden arising from his position as the accused. That nothing you might know or guess about his past should be considered by you at all. Insofar as you are concerned, he was then innocent and he remains innocent until such time as the evidence and matters produced here in the courtroom and in the course of the trial satisfy you that he is guilty.

"I remind you that the piece of paper containing the charges, that is, the information, is not evidence, but is merely the formal way of accusing a person of crime. You must not consider it as evidence of guilt or draw any inference of guilt from the fact that the accused has been arrested and charged. The burden is on the state to prove the accused guilty of the crimes for which he is charged, and he, [the defendant], does not have to prove his innocence. . . .

"[T]he presumption of innocence alone is sufficient to acquit the defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all of the evidence in the case.

"This means that the state must prove every element necessary to constitute the crime charged . . . . It is not enough for the state to prove only certain of those elements, because if proof of even one element is lacking, you must find the accused not guilty of that charge. The state, in other words, can sustain the burden resting on it only if the evidence before you establishes the existence of every element constituting the crime of each crime charged beyond a reasonable doubt.

\* \* \*

"It is the sworn duties of the courts and jurors to safeguard the rights of persons charged with crime by respecting the presumption of innocence which the law gives to every person so charged. But the law is made to protect society and persons whose guilt are not—has not been proven beyond a reasonable doubt and not to protect persons who have been proven guilty beyond a reasonable doubt. If and when the presumption of innocence has been overcome by the evidence proving beyond a reasonable doubt that an accused person is guilty of the crime charged, then it is the sworn duty of the jury to enforce the law and render a verdict of guilty."

discontinue use of the challenged jury instruction warrants reversal under plain error. We directed the trial courts to discontinue use of the challenged instruction in *Schiappa* because "when viewed in isolation, [it] gives rise to a danger of juror misunderstanding." Id., 175. Nevertheless, the challenged instruction was not offered in isolation, and we are not convinced that the potential danger of misunderstanding in the present case was so significant as to affect the fairness and integrity of or the public confidence in the proceeding, as required for reversal under the plain error doctrine. See part II B of this opinion.

C

Supervisory Authority

Finally, we address the defendant's argument that the trial court's contravention of this court's direction to discontinue use of the challenged jury instruction warrants reversal under our supervisory authority. For the reasons discussed in part II C of this opinion, we decline to exercise our supervisory authority to order a new trial where the trial court inadvertently used a jury instruction that we had previously directed the trial courts not to use.

The judgment is affirmed.

In this opinion the other justices concurred.