******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* SHELDON REYNOLDS
(AC 35782)

DiPentima, C. J., and Beach and Bishop, Js.

*Argued March 14—officially released August 19, 2014*

(Appeal from Superior Court, judicial district of
Fairfield, Kavanewsky, J.)

*Alan Jay Black*, assigned counsel, for the appellant
(defendant).

*Susann E. Gill*, supervisory assistant state's attorney,
with whom, on the brief, was *John C. Smriga*, state's
attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Sheldon Reynolds, appeals from the judgment of conviction, rendered after a jury trial, of two counts of murder in violation of General Statutes § 53a-54a (a) and one count of carrying a pistol or revolver without a permit in violation of General Statutes § 29-35. On appeal, the defendant claims that the trial court (1) abused its discretion in admitting evidence of prior misconduct, (2) abused its discretion in admitting into evidence one victim's hearsay statements, (3) violated his sixth amendment right to confront an adverse witness by admitting recordings of two separate 911 calls into evidence, and (4) erred in failing to suppress his written statement in violation of *Michigan* v. *Mosley*, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975). We disagree and affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to the appeal. A couple of years before her murder, one of the victims, Debbie Brown, developed a relationship with the defendant. Brown knew the defendant as "Mad Man," "Donald Davis," or simply "Jimmi." The nature of their relationship was tumultuous. For example, sometime in 2006, the defendant found a photograph of Brown and another male that was taken when Brown had lived in Jamaica. After seeing the photograph, the defendant got angry and told Brown to cut and burn the photograph. During this incident, the defendant accused Brown of being in a relationship with the man in the photograph. Then, he took the photograph from Brown and burned it. Later that same year, the defendant became physical during an argument with Brown and pushed her. The couple, however, stayed together until approximately July, 2008, when Brown and her daughter, Rejeen Morrison, moved out of the apartment they were sharing in Bridgeport with the defendant and moved in with Brown's friend, Cheryl Wilson. After she moved, Brown did not inform the defendant of her new address.

Sometime in August or September, 2008, Brown confided to Beth Landers, who was her employer at the time, about the nature of her troubles with the defendant. During that conversation, Brown sounded very upset. After the conversation, Brown filled out a form for a restraining order seeking protection from the defendant. She attempted to file the request in Stamford, the town where she worked, but the local police could not accept the filing because they lacked jurisdiction over the dispute.

Throughout these months, the defendant repeatedly called Brown's friends, associates, and employers looking for Brown. During his calls, the defendant sounded loud and vulgar, sometimes accusing Brown of cheat-

ing, and refused to hang up when told that she was not there. In reaction to these persistent telephone calls, Brown asked her friends and employers not to put her on the telephone with the defendant even if she was present when the call came in. On the rare occasions when Brown would answer the defendant's calls, she would tell him to stop calling and to stay away from her.

The defendant's attempts to locate Brown were not confined to making just telephone calls. One morning in early October, 2008, at about 5:30 a.m., the defendant climbed into a second story window of a private residence in Greenwich where Brown worked as a home caregiver to an elderly person. He was met by Brown's coworker, Lovella Cooper, who was substituting for Brown at the time. When the defendant realized that Brown was not present, he identified himself as "Jimmi" and told Cooper that he was looking for his wife. The defendant was wearing black clothes, gloves, and a "tam" hat.[1] Once she found out about it, Brown asked Cooper not to report the incident to the police, promising to "handle it." On the morning of October 23, 2008, Brown was confronted by the defendant when she was leaving her residence for work. She was able to get back inside the building and lock the door behind her. The defendant approached the front door saying, "you think I wouldn't find where you live." He then started pounding on the door while repeating several times, "I'm gonna get you . . . I gonna get you." The defendant retreated only after Brown requested police assistance over the telephone.

On December 6, 2008, one day before the murders, the defendant called Wilson on the telephone and told her that he had seen a man, later identified as Desmond McFarland, bring food to Brown's daughter, Morrison, the night before.[2] During that call, the defendant stated that Brown was "his woman," and that if she was to "do anything he'd feel justified for it and he will go [to] prison for anything he do."

At approximately 7:15 p.m. on December 7, 2008, Brown's housemates, Wilson, Sean Nugent, and Stacey Rhodeen, heard a series of loud bangs outside. As Nugent and Rhodeen looked outside to see what was going on, they observed a slim man, dressed in black clothes and wearing a "tam" hat, walk away from the house in a hurry, get into a car that was parked nearby, and leave the scene without turning on the headlights of his car. Responding police officers discovered a car with two victims, Brown and McFarland, inside. McFarland had been shot seven times and Brown had been shot six times; both died from the multiple gunshot wounds. On December 8, 2008, a semiautomatic handgun was found nearby and was later identified as the murder weapon.

As a result of the ensuing criminal investigation, the defendant was arrested on January 16, 2009. He was

charged in a three count information with two counts of murder and one count of carrying a pistol or revolver without a permit. The jury found the defendant guilty on all charges. The court sentenced him to a total effective term of 125 years incarceration. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant's first claim is that the court abused its discretion in admitting evidence of three instances of prior misconduct. Specifically, the defendant claims that the court erred in admitting the (1) evidence that the defendant climbed through the second story window of the Greenwich residence looking for Brown, (2) evidence that Brown had filled out a restraining order application seeking protection from the defendant, and (3) evidence of a domestic dispute witnessed by Morrison, approximately two years before the murders. The defendant further maintains that the prejudicial impact of this evidence outweighed its probative value. We disagree.

We review the admission of the disputed evidence based on an abuse of discretion standard guided by the following principles. "The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Johnson*, 65 Conn. App. 470, 475–76, 783 A.2d 1057, cert. denied, 258 Conn. 930, 783 A.2d 1031 (2001).

Our Supreme Court has established a two part test to determine the admissibility of evidence of a criminal defendant's prior misconduct. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions outlined in § 4-5 (b) of the Connecticut Code of Evidence, and, second, the probative value of such evidence must outweigh its prejudicial effect. *State* v. *Randolph*, 284 Conn. 328, 340, 933 A.2d 1158 (2007).

"Although evidence of prior unconnected crimes is inadmissible to demonstrate the defendant's bad character or to suggest that the defendant has a propensity for criminal behavior . . . such evidence may be admissible for other purposes, such as to prove knowledge, intent, motive, and common scheme or design, if the trial court determines, in the exercise of judicial discretion, that the probative value of the evidence outweighs its prejudicial tendency. . . . That evidence tends to prove the commission of other crimes by the accused does not render it inadmissible if it is otherwise relevant and material . . . ." (Citation omitted; internal

quotation marks omitted.) *State* v. *Ellis*, 270 Conn. 337, 354–55, 852 A.2d 676 (2004).

"It is not essential that the state prove a motive for a crime. . . . But it strengthens its case when an adequate motive can be shown." (Citation omitted.) *State* v. *Hoyeson*, 154 Conn. 302, 307, 224 A.2d 735 (1966). "Evidence of prior misconduct that tends to show that the defendant harbored hostility toward the intended victim of a violent crime is admissible to establish motive." *State* v. *Lopez*, 280 Conn. 779, 795, 911 A.2d 1099 (2007). "When instances of a criminal defendant's prior misconduct involve the same victim as the crimes for which the defendant presently is being tried, those acts are especially illuminative of the defendant's motivation and attitude toward that victim, and, thus, of his intent as to the incident in question." *State* v. *Irizarry*, 95 Conn. App. 224, 235, 896 A.2d 828, cert. denied, 279 Conn. 902, 901 A.2d 1224 (2006). "Because intent is almost always proved, if at all, by circumstantial evidence, prior misconduct evidence, where available, is often relied upon." (Internal quotation marks omitted.) Id., 234.

"The trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . We note that [b]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury." (Citation omitted; internal quotation marks omitted.) *State* v. *Lynch*, 123 Conn. App. 479, 492, 1 A.3d 1254 (2010). "Evidence is prejudicial when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." (Internal quotation marks omitted.) *State* v. *Orr*, 291 Conn. 642, 667–68, 969 A.2d 750 (2009).

"[W]hen the trial court has heard a lengthy offer of proof and arguments of counsel before performing the required balancing test, has specifically found that the evidence was highly probative and material, and that its probative value significantly outweighed the prejudicial effect, and has instructed the jury on the limited use of the evidence in order to safeguard against misuse and to minimize the prejudicial impact . . . we have found no abuse of discretion . . . ." (Internal quotation marks omitted.) *State* v. *Lynch*, supra, 123 Conn. App. 492–93. "Proper limiting instructions often mitigate the prejudicial impact of evidence of prior misconduct.

. . . Furthermore, a jury is presumed to have followed a court's limiting instructions, which serves to lessen any prejudice resulting from the admission of such evidence." (Internal quotation marks omitted.) *State* v. *Pereira*, 113 Conn. App. 705, 715, 967 A.2d 121, cert. denied, 292 Conn. 909, 973 A.2d 106 (2009).

A

The defendant first argues that the court improperly admitted the evidence that he broke into a residence in Greenwich where Brown worked as a home health aide. We are not convinced.

The facts regarding this claim are as follows. Outside the presence of the jury, the state informed the court that it was going to solicit testimony from Brown's coworker, Cooper. Cooper was expected to testify that, sometime in October, 2008, the defendant broke into a private residence where both Cooper and Brown worked as home aides. The state argued that this evidence was relevant for the purposes of showing the defendant's motive and intent. The defendant objected, arguing that such evidence was not relevant because the incident happened two months before the murders, that it was an attempt by the state to introduce otherwise inadmissible evidence of prior bad acts, and that the effect of such evidence would be more prejudicial than probative.

The court overruled the defendant's objection. The court found the proposed evidence of the defendant's misconduct to be admissible as proof of his intent and motive. The court also found that the proposed evidence was not too remote in time because it was consistent with other evidence of the deteriorating relationship between Brown and the defendant that had been presented to the jury. Additionally, the court found the proposed evidence to be admissible to corroborate other testimony. The court concluded that the proposed evidence was "very probative," that its prejudicial effect on the defendant would not outweigh its probative value, and that it was not inflammatory in nature, allowing the jury to fairly balance it.

Following Cooper's testimony, the court instructed the jury that the evidence was not admitted to prove the bad character of the defendant or his tendency to commit criminal acts. The court further explained that the evidence was admitted to "show or establish the defendant's intent, any motive he may have had for the commission of the crimes alleged, or to corroborate other prosecution evidence." The court repeated this caution once again during the final jury instructions.

Cooper's testimony that, approximately two months before the murders, the defendant had broken into a private residence of an elderly person under the cover of darkness tended to show to what extremes the defendant was willing to go to try to locate Brown. This

evidence of the defendant's past behavior is illuminative of the nature of the entire history of the relationship the defendant had with Brown. The court found, and we agree, that the jury reasonably could have inferred from this evidence that there was a bad relationship, and that as a result, the defendant may have had ill will toward Brown or a motive to harm her. The evidence of the break-in tended to show that the defendant acted consistent with such a motive, and the court properly found the evidence to be relevant.

Subsequently, the court balanced the probative value of the defendant's uncharged misconduct against its prejudicial effect. The court specifically found that the proposed evidence was not inflammatory and that a jury could fairly balance it. Recognizing some potential for prejudice, however, the court specifically limited the use of the evidence to proving intent and motive. The court also instructed the jury that it could not use the evidence to prove the bad character of the defendant or his tendency to commit criminal acts. Finally, the court repeated this clear caution once again during the final jury charge.[3]

On the basis of all of the factors mentioned previously, we conclude that the court did not abuse its discretion in finding that the evidence of the break-in was relevant and that its probative value outweighed its prejudicial effect.

B

The defendant next argues that the court improperly admitted into evidence an application for a restraining order that Brown had in her purse at the time of the murders. Specifically, the defendant argues that (1) the application for a restraining order was a testimonial hearsay and, therefore, inadmissible in accordance with principles set out in *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), (2) the application was not relevant because it was not dated, and (3) the prejudicial effect from the admission of the application outweighed its probative value. We are not persuaded.

The following additional facts are relevant. The unfiled application for a restraining order was found inside Brown's purse. The application identified the defendant as the person from whom Brown sought protection. The state sought to introduce a redacted copy of the application during the testimony of Brown's sister, Yvette Johnson. The defendant objected to the evidence, arguing that it violated his right to confrontation under the sixth amendment, that it was not relevant because it was undated, and that it was more prejudicial than probative. After hearing from the state and the defendant, the court overruled the objection. The court found that "the evidence of a restraining order application is admissible to show a deteriorating or broken

relationship between . . . Brown and the defendant. It's not hearsay. It's not being offered or admitted to show that Ms. Brown's state of mind was reasonable or objectively justified; it's being offered exclusively to show her subjective state of mind . . . ." The court followed up the admission of the evidence with a jury instruction, cautioning the jury to consider this evidence only for the purposes of showing the nature of the relationship between Brown and the defendant. Later during the trial, Brown's employer, Landers, testified that she tried to help Brown file the restraining order against the defendant in August or September, 2008.

1

The defendant first claims that the admission into evidence of the application for a restraining order constituted impermissible hearsay and violated his constitutional right to confront an adverse witness under the sixth amendment. We note, however, that the constitutional guarantees of the confrontation clause apply only when testimonial hearsay statements are involved. As the United States Supreme Court has held, the introduction of nonhearsay statements does not trigger the protections of the confrontation clause. See *Tennessee* v. *Street*, 471 U.S. 409, 414, 105 S. Ct. 2078, 85 L. Ed. 2d 425 (1985) (nonhearsay aspect of defendant's confession—not to prove what happened at murder scene but to prove what happened when defendant confessed—raised no confrontation clause concerns); *Crawford* v. *Washington*, supra, 541 U.S. 59 n.9 (confrontation clause does not bar use of testimonial statements for purposes other than establishing truth of matter asserted).

Therefore, in order to determine whether the defendant's constitutional rights were indeed violated, we decide whether the application for a restraining order constitutes a hearsay statement. "[W]hether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review." *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007).

The Connecticut Code of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the proceeding, offered in evidence to establish the truth of the matter asserted." Conn. Code Evid. § 8-1 (3). "An out-of-court statement is not hearsay, however, if it is offered to illustrate circumstantially the declarant's then present state of mind, rather than to prove the truth of the matter asserted. . . . Of course, for any such out-of-court statement to be admissible, it must be relevant to an issue in the case." (Citations omitted; internal quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 138, 763 A.2d 1 (2000).

In this case, the court admitted the application for a

restraining order as circumstantial evidence of Brown's subjective state of mind. The application was redacted heavily and did not contain an affidavit explaining the reasons Brown was seeking protection from the defendant. See *Commonwealth* v. *Cheremond*, 461 Mass. 397, 410, 961 N.E.2d 97 (2012) (holding admission of abuse prevention order proper as evidence of nature of relationship between victim and defendant, but holding accompanying affidavit in support of order inadmissible). In addition, the court instructed the jury on the limited purpose of the evidence. For these reasons, we agree with the court that the application for a restraining order was not hearsay, and, therefore, its admissibility was properly determined by the court.

2

The defendant next claims that the application for a restraining order was improperly admitted by the court because it was not dated and, therefore, not relevant, and that the probative value from the admission of the application was outweighed by its prejudicial effect. We are not persuaded.

"It is well established in our jurisprudence that, where a marital or romantic relationship existed between a homicide victim and the defendant, evidence of the victim's fear of the defendant suggests a deterioration of that relationship, which is relevant to the issues of motive and intent." *State* v. *Smith*, 275 Conn. 205, 217, 881 A.2d 160 (2005).

In this case, the application for a restraining order illuminated Brown's subjective state of mind—her fear of the defendant. The evidence also reasonably could have been used by the jury as the basis for an inference of the defendant's motive and intent. The fact that the application was not dated does not make it irrelevant. The absence of the date implicates the weight of the evidence, but not its relevance. Moreover, Landers testified that Brown tried to file the application in August or September, 2008. From this testimony, the jury could have reasonably inferred that the application was filled out by Brown during that time frame. From this we conclude that the court correctly determined the evidence to be relevant. In addition, having reviewed the record, we conclude that the court properly balanced the probative value of the evidence against its potential prejudicial impact. Also, the court immediately followed its decision to admit the evidence with a clear and concise jury instruction, and "jurors are presumed to follow the instructions that they are given." *Eisenbach* v. *Downey*, 45 Conn. App. 165, 181, 694 A.2d 1376, cert. denied, 241 Conn. 926, 696 A.2d 1264 (1997). On that basis, we conclude that the court did not abuse its discretion in admitting into evidence the application for a restraining order.

C

The defendant's third argument is that the court improperly admitted into evidence the testimony of Morrison, who stated that the defendant burned a photograph depicting Brown hugging another male in 2006, and that he used physical force against Brown at some time later that year. Specifically, the defendant contends that both incidents were too remote in time to be relevant, and that the prejudicial effect from their introduction outweighed any probative value. We are not convinced.

At trial, the defendant objected to the testimony of Morrison about the two incidents that had taken place in 2006, arguing that it was not relevant because the incidents happened two years before the murders and that this evidence was more prejudicial than probative. The court overruled the defendant's objection, finding that the time frame of the incidents affected the weight of the evidence, not its admissibility. The court also overruled the prejudice based objection, but instructed the jury that the evidence was admitted for the limited purpose of showing the defendant's intent, and as an explanation for future conduct as well as the nature of the relationship between Brown and the defendant. The court also specifically instructed the jury not to infer that the defendant was a person of bad character or that he had a propensity to commit criminal acts. This instruction was repeated by the court during the final jury charge.

1

As we previously have stated, in our jurisprudence, evidence of a deteriorating "marital or romantic relationship" is considered relevant. See *State* v. *Smith*, supra, 275 Conn. 217. In fact, as our Supreme Court noted, "[t]his view finds support in the case law of multiple jurisdictions as well as common experience. See *Gattis* v. *State*, 637 A.2d 808, 818 (Del.) ('[i]n a prosecution for homicide arising out of a marital or romantic relationship, evidence of previous discord between the victim and the defendant is clearly material to issues of motive and intent'), cert. denied, 513 U.S. 843, 115 S. Ct. 132, 130 L. Ed. 2d 75 (1994) . . . ." (Citations omitted.) *State* v. *Smith*, supra, 217. Moreover, we agree with the court's rationale that the time frame of the incidents did not render them irrelevant. See *State* v. *Wargo*, 53 Conn. App. 747, 760–61, 731 A.2d 768 (1999) (evidence that defendant nailed board to front door to prevent wife from entering house eleven months before murder admissible to show motive), aff'd, 255 Conn. 113, 763 A.2d 1 (2000); see also *State* v. *Syriani*, 333 N.C. 350, 375–76, 428 S.E.2d 118 (evidence that defendant slapped and threatened his wife admissible despite being two years old), cert. denied, 510 U.S. 948, 114 S. Ct. 392, 126 L. Ed. 2d 341 (1993); *State* v. *Berry*, 176 W. Va. 291, 294, 342 S.E.2d 259 (1986) (evidence of prior threat against murder victim not too

remote, where incident occurred year to eighteen months prior to murder). At the most, the time frame of the incidents, and the court had pointed it out, bore on the weight of the evidence and not its relevance. The jury is presumed capable of determining the weight of the presented evidence, and the court specifically reminded the jury that it had to do so in this case.

We are also not persuaded by the defendant's arguments that the effect of this evidence was more prejudicial than probative. Having reviewed the record, we conclude that the court properly balanced the probative value of the evidence of the defendant's prior abusive conduct toward Brown with its potential prejudicial impact. Moreover, by carefully instructing the jury, the court properly limited the use of the evidence and, subsequently, its potential prejudicial effect. We, therefore, conclude that the court did not abuse its discretion in finding the evidence relevant and more probative than prejudicial.

II

We next address the defendant's claim that the court abused its discretion in admitting evidence related to Brown's mental state as an exception to the hearsay rule. Specifically, the defendant claims that the testimony of Landers, Wilson and Nugent constituted inadmissible hearsay and that the effect of this testimony was more prejudicial than probative. We disagree.

We begin our analysis by setting forth the appropriate standard of review. "[W]hether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Citations omitted.) *State* v. *Saucier*, supra, 283 Conn. 218.

A

Testimony of Landers

During the trial, Landers testified that sometime in August or September, 2008, Brown told her about an incident between Brown and the defendant. Landers further stated that, during that discussion, Brown appeared worried and agitated. The defendant objected to the introduction of the term "incident," arguing that it constituted hearsay. The court overruled the defendant's objection, finding that the evidence was not hearsay and was, therefore, admissible to bear circumstantially on Brown's subjective state of mind and the nature of the relationship between Brown and the defendant. Thereafter, the court instructed the jury on the limited nature of the evidence.

As we have stated before, to constitute hearsay a statement must be introduced to prove the truth of the

matter asserted in the statement. This is not the case here; the state did not offer Landers' testimony to prove that the incident indeed had taken place. It was offered as evidence of the deteriorating relationship between Brown and the defendant. We, therefore, conclude that the court properly determined that Landers' testimony was not hearsay. We also conclude that the court properly determined that this evidence was relevant to the case because it allowed the jury to consider the deterioration of the relationship between Brown and the defendant, as well as the defendant's motive and intent. See *State* v. *Dehaney*, 261 Conn. 336, 356, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003). We are also satisfied that the court did not abuse its discretion when it weighed the probative effect of the evidence against its prejudicial potential. Finally, any potential prejudice was mitigated by the court's limiting instruction to the jury.[4]

## B

### Testimony of Wilson and Nugent

At trial, Wilson testified that, during the time Brown stayed at Wilson's apartment, Brown had stated that she felt threatened by the defendant, that she was afraid for her life and that she was afraid of the defendant killing her. In addition, Nugent testified that he had heard Brown tell the defendant over the telephone not to call and to stay away. The defendant objected to their testimony on the ground of hearsay. The state countered that the testimony was relevant to show Brown's state of mind. The court overruled the defendant's objection, finding that the offered statements were not hearsay because they were not offered for their truth. The court also found the evidence to be relevant to show Brown's state of mind.

The defendant argues that the court improperly admitted this evidence because it was inadmissible hearsay, that it was not relevant to the case and that it was more prejudicial than probative. We do not agree.

The testimony tended to show Brown's state of mind, namely, her fear of the defendant and the deteriorating relationship between them. As discussed in part II A of this opinion, Brown's subjective fear of the defendant tended to reflect a deteriorating relationship as well as the defendant's intent and motive to commit the murders, which were all relevant to the issues in the case. We, therefore, conclude that the court properly admitted the testimony into evidence.

## III

The defendant's third claim is that the court violated his sixth amendment right to confront an adverse witness by allowing 911 recordings of two separate calls made by Brown to be played in the presence of the jury. Specifically, the defendant claims that the court erred in admitting recordings of 911 calls Brown made

on October 21, 2008, and October 23, 2008. The defendant further maintains that the 911 calls occurred two months before the murders and, therefore, they were too remote to be relevant. Finally, the defendant argues that the prejudicial impact of the 911 calls outweighed their probative value. We disagree.

The applicable legal principles were outlined by the United States Supreme Court in *Crawford* v. *Washington*, supra, 541 U.S. 68–69, where the court held that the hearsay statements of an unavailable witness that are testimonial in nature may be admitted under the sixth amendment's confrontation clause only if the defendant has had an opportunity to cross-examine the declarant. "Thus, the threshold inquiry for purposes of the admissibility of such statements under the confrontation clause is whether they are testimonial in nature. Because this determination is a question of law, our review is plenary." (Internal quotation marks omitted.) *State* v. *Serrano*, 123 Conn. App. 530, 534, 1 A.3d 1277 (2010), cert. denied, 300 Conn. 909, 12 A.3d 1005 (2011). Whether a particular hearsay statement is testimonial depends on "the reasonable expectation of the declarant that, under the circumstances, his or her words later could be used for prosecutorial purposes." (Internal quotation marks omitted.) Id.; see also *State* v. *Rivera*, 268 Conn. 351, 363–64, 844 A.2d 191 (2004) (noting that traditional testimonial hearsay are "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" [internal quotation marks omitted]).

A

The defendant first argues that the court violated his sixth amendment right to confront an adverse witness when it admitted into evidence the audio recording of Brown's 911 call on October 21, 2008. The defendant argues that Brown made this call sometime after the incident, that there was no ongoing emergency, and that her statements were inadmissible testimonial hearsay. Without deciding whether the state violated the defendant's sixth amendment right to confront an adverse witness, we conclude that any error was harmless and would not have affected the verdict.

Before "a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. . . . The state bears the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt. . . . That determination must be made in light of the entire record." (Citations omitted; internal quotation marks omitted.) *State* v. *Daugaard*, 231 Conn. 195, 212, 647 A.2d 342 (1994), cert. denied, 513 U.S. 1099, 115 S. Ct. 770, 130 L. Ed. 2d 666 (1995). Whether a constitutional violation "is harmless in a particular case depends upon a number of factors, such as the impor-

tance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Colton*, 227 Conn. 231, 254, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996).

The state introduced the October 21, 2008 call for the purpose of establishing the extent of Brown's fear of the defendant and how that may have shown the nature of her relationship with him. There was, however, ample evidence of Brown's fear of the defendant that was admitted properly during the trial, making the October 21, 2008 call cumulative. Specifically, there was testimony regarding Brown's statements to her housemate, Wilson, that she worried for her safety and that she was afraid of the defendant killing her. Additionally, there was testimony of several witnesses stating that Brown was always on the lookout and would not leave her house if there were any strange vehicles outside the house. And finally, there was testimony about Brown's repeated efforts to avoid the defendant and her effort to file a restraining order, as well as her second 911 call made while he confronted Brown on October 23, 2008. In light of that evidence of Brown's fear, the evidence of the 911 call on October 21, 2008, was cumulative. See *State* v. *Madigosky*, 291 Conn. 28, 46, 966 A.2d 730 (2009) (statement of defendant's mother cumulative in that it was only one of several pieces of evidence jury heard).

Furthermore, as a detailed examination of the record suggests, the state's case against the defendant was wholly consistent with the defendant's guilt and inconsistent with the defendant's uncorroborated alibi.[5] Deputy United States Marshal James Masterson testified at trial that the defendant was not in New York City on the day of the murders. Instead, the defendant's cell phone records showed that his cell phone was used in Bridgeport throughout the day and was last used at 6:33 p.m.—approximately forty-five minutes before the murders. Similarly, Nicola Blake, the defendant's niece, testified that she encountered him in Bridgeport on the night of the murders. In addition, Nugent testified that, immediately after he heard the loud bangs on the night of the murders, he saw a slim built man wearing a "tam" hat quickly leaving the scene. Nugent further testified that the man's gait was impeded in some way—a description consistent with the defendant's limp when walking fast, as testified to by Morrison, who personally knew the defendant. Finally, there was testimony from

the defendant's acquaintance, Mark Stewart, who stated that the defendant had confessed to him about the murders. The state also presented evidence of the defendant's continued efforts to locate Brown through telephone calls to her friends, associates and even employers, his threats and accusations made during these calls, as well as the defendant's unannounced visit to her workplace in October, 2008. It is against this backdrop of evidence presented at trial that we conclude that the introduction of the 911 call made on October 21, 2008, was harmless beyond a reasonable doubt.

B

The defendant also challenges the admission of the audio recording of the 911 call on October 23, 2008, that Brown made. The defendant once again claims that the call was not made during an ongoing emergency, and, therefore, it constituted inadmissible testimonial hearsay. We disagree.

The following additional facts are relevant to this issue. The evidence of Brown making a 911 call on October 23, 2008, first came through the testimony of Rhodeen. She testified that early one morning, she heard a commotion downstairs when Brown and her daughter, Morrison, were about to leave the house. Rhodeen then heard Brown's daughter saying, "mommy, close the door." Afterward, she heard a male voice saying, "is that your man," in Jamaican Creole language.[6] Rhodeen further testified that the tone of the male's voice was aggressive, and that it sounded similar to the voice of the person who previously had called the house telephone looking for Brown. Rhodeen further testified that she then heard Brown saying, "I'm going to call the police." Following this, Rhodeen heard Brown saying, "there's a man outside my house stalking me."

Later in the trial, the state alerted the court that it would be offering a portion of the October 23, 2008 call as evidence. The defendant objected, arguing that the admission of the call would violate his sixth amendment right of confrontation and that it was inadmissible hearsay. The court ruled that it would admit the call, but ordered a redaction of the portion where Brown told the 911 operator that the defendant was leaving and provided the description of his car.

Once the testimony resumed in the presence of the jury, Morrison testified about the morning incident during which Brown made the 911 call. Morrison stated that on that morning, immediately after she had let Brown out and locked the front door behind her, Brown returned to the house because she encountered the defendant outside. Brown then told Morrison that the defendant had a knife. Morrison testified that she heard the defendant saying, "[y]ou think I wouldn't find where you live." Morrison further stated that the defendant

started pounding on the front door while saying, "I'm gonna get you . . . I'm gonna get you." During that time, Brown called the police using her cell phone.

The state then offered the 911 call into evidence. The court admitted the 911 call and immediately instructed the jury to use it only for the purpose of establishing whether Brown feared the defendant, the extent of any such fear and how it showed the nature of her relationship with the defendant.

After Morrison was cross-examined by the defendant, the state asked the court to admit the unredacted recording of the 911 call, arguing that hearing the entire call would help the jury understand why neither the defendant's threats nor his pounding on the door could be heard on the redacted version of the recording. The state asked the court to admit Brown's unredacted statements under the excited utterance or the present sense impression exceptions to the hearsay rule, making them available for their truth.

The defendant renewed his objections, citing the sixth amendment and the hearsay rule. Overruling the objections, the court admitted the entire audio recording of the 911 call under the spontaneous utterance exception to the hearsay rule. The court then instructed the jury not to use the 911 call as evidence of the defendant's bad character or tendency to commit criminal acts. Finally, the court repeated this instruction in its final charge to the jury.

1

The defendant first asserts that the 911 call contained testimonial hearsay, and that the court erroneously admitted the recording of that call into evidence in violation of his rights under the confrontation clause of the sixth amendment. We are not persuaded.

The test for determining whether statements to police are testimonial was articulated by the United States Supreme Court in *Davis* v. *Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), where the court held that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."[7]

The United States Supreme Court further elaborated on the "ongoing emergency" in *Michigan* v. *Bryant*, U.S. , 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011). The court noted that the existence of an ongoing emergency is "a highly context-dependent inquiry"; id., 1158; that should objectively consider, among other things,

(1) the scope of the emergency and whether it is public or private in nature, (2) the type of weapon involved, and (3) the medical condition of the declarant. Id., 1158–59. The court went on to add that such an inquiry must focus objectively on the perspectives of the parties at the time of the statements; the court explained that if "the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for the purposes of the [c]onfrontation [c]lause." Id., 1157 n.8.

*Davis* involved a domestic disturbance during which the victim called 911 and told the operator that a known assailant physically assaulted her and then fled the scene. As the assailant was fleeing, the victim informed the 911 operator that the assailant was " 'runnin' now,' " adding that he was leaving in the car with another person. *Davis* v. *Washington*, supra, 547 U.S. 818. The court found these statements nontestimonial because (1) the victim was speaking about the events as they were actually happening rather than describing past events; (2) any reasonable listener would recognize that she was facing an ongoing emergency; (3) her statements were necessary to be able to resolve the present emergency, rather than to establish what happened in the past; and (4) her statements were made not in a "tranquil" environment, but instead were made over the telephone in an unsafe environment, as far as a reasonable 911 operator could make out. Id., 827.

In *Bryant*, the police responded to a radio dispatch informing them of a man who had been shot. Upon their arrival, the police found the victim lying on the ground at a gas station. In response to the police questions, the victim stated that he was shot by the defendant at the victim's house and then drove himself to the gas station, looking for help. Police subsequently travelled to the victim's house where they found the evidence of the shooting and the defendant's wallet and identification. At trial, the police officers were permitted to testify about what the victim, who had died from the wound, had told them at the gas station. The court held that the victim's statements were nontestimonial because the primary purpose of the interrogation was to enable police to respond to an ongoing emergency. *Michigan* v. *Bryant*, supra, 131 S. Ct. 1165–67.

The circumstances of the 911 call Brown made on October 23, 2008, are closely analogous with those identified in *Davis*. As Brown was making her call, she was clearly describing events as they were unfolding. In the beginning part of the call, Brown had twice stated that the defendant was at her front door "now." Moreover, as the situation started to change, Brown informed the 911 operator about it by stating that the defendant was leaving toward a certain direction in his car. It is also clear that Brown was facing an emergency situation at

the time of the call. She stated that she was being harassed by the defendant "now," while she was trying to leave her house for work. In addition, Brown did not make any statements that were meant to establish any events that happened in the past. Instead, she clearly described the then current situation as she observed it. Such statements were needed for the police to ascertain and respond to the situation adequately. Even the 911 operator's efforts to establish the defendant's identity were necessary "so that the dispatched officers might know whether they would be encountering a violent felon." *Davis* v. *Washington*, supra, 547 U.S. 827. And finally, Brown did not provide her statements to the police during a formal interview at the local precinct. Instead she made her 911 call while the defendant was present on the scene and the environment was not objectively tranquil or safe. Just as in *Davis*, instead of being testimonial, Brown's 911 call was "plainly a call for help against a bona fide physical threat," and any reasonable 911 operator would be able to recognize it as such. Id.

Viewing the surrounding circumstances of the 911 call objectively, we conclude that neither the context nor content of the call reasonably would have suggested to Brown that her statements made during that call would be used to establish or prove events at a later prosecution of the defendant, whom she had just encountered while leaving the house on the way to work. To the contrary, the primary purpose of the October 23, 2008 call was to enable the 911 operator to collect from Brown the information needed to meet the ongoing emergency. See *State* v. *Clue*, 139 Conn. App. 189, 203–204, 55 A.3d 311 (2012) (finding victim's statements, made in 911 call, nontestimonial because their primary purpose was to enable police to respond adequately to ongoing emergency), cert. denied, 307 Conn. 946, 60 A.3d 738 (2013). Therefore, we conclude that the court properly determined that Brown's statements in the 911 call made on October 23, 2008, were nontestimonial and that their introduction did not violate the defendant's rights under the sixth amendment.

2

The defendant next claims that even if Brown's statements made during the October 23, 2008 911 call were not testimonial in nature, they constituted hearsay that did not fall within the spontaneous utterance exception under § 8-3 (2) of the Connecticut Code of Evidence and, therefore, were admitted by the court erroneously. We disagree.

Connecticut Code of Evidence § 8-2 provides that hearsay is inadmissible unless it fits into one of the exceptions enumerated in § 8-3 of the code. The code provides that a spontaneous utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused

by the event or condition." Conn. Code Evid. § 8-3 (2). As our previous decisions explain, "[h]earsay statements, otherwise inadmissible, may be admitted into evidence to prove the truth of the matter asserted therein when (1) the declaration follows a startling occurrence, (2) the declaration refers to that occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant." (Internal quotation marks omitted.) *State* v. *Kendall*, 123 Conn. App. 625, 666, 2 A.3d 990, cert. denied, 299 Conn. 902, 10 A.3d 521 (2010).

We begin by setting forth the relevant legal standard of review. "[W]e review the trial court's determination that . . . [a] statement was an excited utterance under the abuse of discretion standard. *State* v. *Saucier*, [supra, 283 Conn. 219] (whether a statement is truly spontaneous as to fall within the spontaneous utterance exception will be reviewed with the utmost deference to the trial court's determination)." (Citation omitted; internal quotation marks omitted.) *State* v. *Slater*, 285 Conn. 162, 178–79, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008). "Whether an utterance is spontaneous and made under circumstances that would preclude contrivance and misrepresentation is a preliminary question of fact to be decided by the trial judge. . . . The trial court has broad discretion in making that factual determination, which will not be disturbed on appeal absent an unreasonable exercise of discretion." (Internal quotation marks omitted.) *State* v. *Davis*, 109 Conn. App. 187, 193, 951 A.2d 31, cert. denied, 289 Conn. 929, 958 A.2d 160 (2008).

In its ruling rejecting the defendant's objection, the court specifically found that Brown made her statements "within the throes of a startling event at or about the very time that it occurred and without opportunity for pause or reflection . . . ." Subsequently, the court ruled that Brown's statements qualified as a spontaneous utterance. The facts in the record support the court's finding. On that morning, Brown unexpectedly encountered the defendant as she exited her house on the way to work. She then managed to return inside the house and close the door behind her. The defendant came to the front door and started pounding on it and threatening her by saying, "I'm gonna get you . . . I'm gonna get you." When Brown called the 911 service, the defendant was still at her front door, and she stated that fact to the 911 operator twice. Additionally, there is no reason to doubt that Brown was personally observing the events as she was describing them to the 911 operator. And finally, because Brown was relaying the events she was witnessing to the 911 operator as they were unfolding in front of her, she, as the court aptly noted, had no time to fabricate her statements.[8] Therefore, in light of the totality of the evidence in the record, we conclude that the court did not abuse its discretion

in finding that Brown's statements during the 911 call were admissible as a spontaneous utterance under § 8-3 (2) of the Connecticut Code of Evidence.

3

Finally, the defendant argues that the court abused its discretion by admitting the 911 call into evidence in violation of § 4-5 of the Connecticut Code of Evidence, which prohibits the introduction of other crimes, wrongs or acts. We disagree.

The relevant legal principles applicable to this argument are outlined in part I of this opinion. Applying these principles to the argument at hand, we are satisfied that the court did not abuse its discretion in admitting the 911 call into evidence. First, Brown's statements tend to illuminate the nature of the relationship between Brown and the defendant, and help prove the defendant's motive and intent to commit the charged crimes. We agree with the court that this makes the statements relevant. Second, we conclude that the court properly balanced the probative value of the evidence against its prejudicial effect. In this case, the court heard lengthy arguments from the state and the defendant before ruling on the admissibility of the evidence. Furthermore, the court followed its ruling with an instruction to the jury not to infer that the defendant was a person of bad character or that he had a propensity to commit crimes. We, therefore, conclude that the court did not abuse its discretion by admitting the October 23, 2008 911 call into evidence.

IV

The defendant's final claim is that the written statement he gave to the police on January 29, 2009, should have been suppressed because the police did not "scrupulously honor" his right to remain silent in violation of the rule set forth by the United States Supreme Court in *Michigan* v. *Mosley*, supra, 423 U.S. 96. We disagree.

The facts regarding this claim are as follows. After his arrest on January 16, 2009, the defendant was transported to a secure facility in New York City. Once there, Bridgeport police Detective Christopher Borona, advised the defendant of his *Miranda*[9] rights from a standard form used by his department. The defendant filled in the upper portion of the form with his name, age, date of birth, and the date. The defendant also answered in the affirmative that he was capable of reading and writing. The bottom portion of the form also contained a waiver allowing the accused to voluntarily waive his or her *Miranda* rights. The defendant, however, declined to sign the waiver portion of the form, but immediately stated that he was nowhere near Bridgeport on the night of the murders, and did not know anything about them.[10] Following these statements, Borona asked the defendant three additional questions, which he refused to answer.[11] At that point,

the interview ended.

Thirteen days later, on January 29, 2009, Borona once again approached the defendant after his transfer from New York to Connecticut. Borona advised the defendant of his *Miranda* rights anew and offered him an opportunity to sign the waiver, which the defendant accepted. During the ensuing interview, the defendant made a written statement claiming that he spent the entire day of December 7, 2008, in New York City with his children.

The defendant later moved to suppress this statement. At the conclusion of the suppression hearing, the court denied the motion to suppress the defendant's statement made on January 16, 2009, finding that the statement was not elicited by the police and was not the result of interrogation. The court also denied the suppression of the defendant's written statement made on January 29, 2009. The court found that the defendant made the statements on both dates voluntarily, understandingly, and knowingly. In conclusion, the court added that even if the defendant had invoked his right to remain silent during January 16, 2009 interview, the police were not precluded from approaching him again on January 29, 2009, under the precedent established in *State* v. *Stanley*, 223 Conn. 674, 613 A.2d 788 (1992).

As a threshold matter, we set forth the appropriate standard of review of the trial court's decision on a motion to suppress. "[T]o the extent that the trial court has made findings of fact, our review is limited to deciding whether those findings were clearly erroneous. Where, however, the trial court has drawn conclusions of law, our review is plenary, and we must decide whether those conclusions are legally and logically correct in light of the findings of fact." (Internal quotation marks omitted.) *State* v. *Nowell*, 262 Conn. 686, 694, 817 A.2d 76 (2003). When, however, "a trial court's determination . . . implicates a defendant's constitutional rights . . . we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. . . . However, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 43, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

The defendant argues that the court improperly denied his motion to suppress his written statement from January 29, 2009. The defendant maintains that he invoked his right to remain silent when he refused to sign the waiver portion of the *Miranda* form on January 16, 2009, and that the principle established by the United States Supreme Court in *Mosley* requires the police to "scrupulously honor" a suspect's right to remain silent by immediately terminating any further

questioning following the invocation of the right. The defendant reasons that asking three follow up questions after he had refused to sign his *Miranda* waiver violated the *Mosley* requirements and, therefore, any statements made by the defendant afterward must be excluded. In addition, the defendant argues that the thirteen day interval between the first and the second interviews does not make the *Miranda* waiver signed by the defendant on January 29, 2009, valid because he remained in police custody for the entire period. We find these arguments to be unpersuasive.

As this court previously has stated, an "inquiry into the admissibility of a statement obtained while a defendant is in custody must, of course, begin with [*Miranda* v. *Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)]. In that case, the United States Supreme Court held that the fifth and fourteenth amendments' prohibition against compelled self-incrimination requires that a suspect in police custody be informed specifically of his or her right to remain silent . . . . The court further held that . . . [i]f the interrogation continues . . . and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Smith*, 107 Conn. App. 746, 750–51, 946 A.2d 926, cert. denied, 288 Conn. 905, 953 A.2d 650 (2008); see also *Berghuis* v. *Thompkins*, 560 U.S. 370, 384, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) (holding that where prosecution shows *Miranda* warning was given and understood by accused, accused's uncoerced statement establishes implied waiver of right to remain silent).

In addition, in *State* v. *Smith*, supra, 107 Conn. App. 752, we held that voluntary statements made to police during post-*Miranda* interrogations are admissible as long as there is no evidence of threats, coercion, deceptive tactics or promises by the police in the record. It is axiomatic, therefore, that an accused who has decided to speak after he has received and understood the *Miranda* warning "has chosen unambiguously not to assert his right to remain silent. He knows that anything he says can and will be used against him . . . ." *State* v. *Talton*, 197 Conn. 280, 295, 497 A.2d 35 (1985).

As the defendant's argument is premised on the decision in *Mosley*, a brief review of that case will facilitate our discussion. In *Mosley*, the defendant was arrested for robbery and was read the *Miranda* warning. When police attempted to interrogate him, the defendant refused to talk and the officer then ended the interview. Approximately two hours later, another officer interrogated the defendant about another unrelated crime. The defendant was once again advised of his *Miranda* rights and signed the form. He then proceeded to make a statement implicating himself in the second crime.

Later, the defendant moved to suppress his statement. *Michigan* v. *Mosley*, supra, 423 U.S. 98–99. The court held that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored. . . . The court then concluded that the defendant's right to cut off questioning was fully respected because: (1) the first interrogating police officer had immediately ceased his interrogation when the defendant invoked his right to remain silent; (2) the second interrogating police officer had waited a significant period of time, more than two hours, before reinterrogating the defendant; (3) the reinterrogation concerned a crime unrelated to the first interrogation; and (4) before the second interrogation began, the defendant had been advised of his *Miranda* rights and had waived those rights." (Citation omitted; internal quotation marks omitted.) *State* v. *Stanley*, supra, 223 Conn. 692. The purpose behind the requirement to "scrupulously honor" the invocation of the right to remain silent is to avoid instances when the police do not "honor a decision of a person in custody to cut off questioning either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Michigan* v. *Mosley*, supra, 105–106.

In the present case, the defendant is not challenging the fact that he received and understood the *Miranda* warning from the police. Therefore, he acted with full understanding of what rights were available to him following the *Miranda* warning. Nevertheless, the defendant chose to volunteer to the police his unsolicited exculpatory statement that he was not near the scene of the crime and did not know anything about it on January 16, 2009. All the facts in the record suggest that the defendant did so knowingly, voluntarily, and with full understanding of the consequences. The crucial distinction from *Mosley* is that, in this case, the defendant did not remain silent after he was arrested and advised of his rights and, therefore, expressly chose to forgo his right to remain silent. The defendant's reliance on *Mosley* is erroneous because his statement that he was nowhere near the crime scene and that he did not know anything about the murders was a waiver of his right to remain silent, and the police were not required to stop their interview at that point. Similarly, the police were not prohibited from approaching the defendant again on January 29, 2009, because he did not invoke his right to remain silent during the thirteen day period between the interviews and, prior to making the statement, he signed a valid waiver. Accordingly, the court properly denied the defendant's motion to suppress.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant often was seen wearing a "tam" hat.

[2] By this time, Brown had developed a friendly relationship with the second victim in this case, McFarland, who helped her with her transportation needs and brought some food for Brown's family every Friday.

[3] We also note that the jury was not told that the defendant was later arrested and charged as a result of this incident.

[4] In his brief, the defendant also challenges Landers' testimony as an introduction of a prior bad act by the defendant. Our review of the trial record reveals, however, that the defendant never raised this objection during the trial. We, therefore, decline to review this claim. See *State* v. *Jose G.*, 102 Conn. App. 748, 756, 929 A.2d 324 (2007) (reviewing court not bound to consider claims of law not made at trial), aff'd, 290 Conn. 331, 963 A.2d 42 (2009).

[5] In his written statement to the police, the defendant claimed that, on the day of the murders, he was in New York City with his daughter. See part IV of this opinion.

[6] Brown's friend, McFarland, was just outside the house in his car at that time.

[7] In *Davis*, the court assumed, without deciding, that the 911 operators were law enforcement officers. *Davis* v. *Washington*, supra, 547 U.S. 823 n.2.

[8] We also note that Brown's statements were corroborated by the testimony of two witnesses, Rhodeen and Morrison. Their testimony provided further support for the proposition that Brown was describing events as they were unfolding.

[9] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[10] On the appeal, the defendant is not challenging the admission into evidence of this particular statement, but it was challenged by the defendant during the suppression hearing.

[11] The following is a transcript of a relevant portion of the testimony by Detective Borona during the suppression hearing:

"The Court: Just so that I'm clear, on the January 16 incident where you—he was arrested [on] Castle Hill [Avenue in the Bronx, New York], and then your meeting him in the marshal's office in Brooklyn [New York].

"[Borona]: Yes.

"The Court: Okay. You went over—you testified you went over the form; he said that he wasn't going to sign it.

"[Borona]: Correct.

"The Court: All right. And you also said that he said I [wasn't] anywhere near Bridgeport when this happened, and I don't know anything about it, words to that effect?

"[Borona]: Yes.

"The Court: Now, you also gave testimony that the interview continued for two or three minutes, and you asked him a couple questions about where he lived at the time—or who lived with him?

"[Borona]: Yes.

"The Court: And his aliases?

"[Borona]: Yes.

"The Court: Did those questions come before or after you say he made the statement about not being anywhere near there in Bridgeport when this happened and not knowing anything about it. I just want to get my sequence right.

"[Borona]: After.

"The Court: So, the [two] or three questions—which was first, I'm sorry?

"[Borona]: He stated, I was nowhere near Bridgeport when this incident happened, and then he was asked the questions after that.

"The Court: All right. So, you said he wasn't going to sign it. Then he—you didn't ask him the question; he said—you said he said this.

"[Borona]: Correct.

"The Court: And then afterward, you asked him a couple questions about who lived with him and the aliases?

"[Borona]: Yes.

"The Court: Which he refused?

"[Borona]: Yes."